## UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
:
UNITED STATES OF AMERICA,           :
:
 v.                                  :
:          Case No. 22-cr-560 (CS)
FRANK BUTSELAAR,                     :
:
              Defendant.             :
:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## DEFENDANT FRANK BUTSELAAR'S MEMORANDUM OF LAW IN SUPPORT
## OF HIS MOTION
## <u>TO DISMISS THE INDICTMENT</u>

Kerry Lawrence
Law Office of Kerry Lawrence PLLC
140 Grand Street
Suite 705
White Plains, NY 10601
(914) 946-5900
kerry@kerrylawrencelaw.com

Diane Fischer
Law Office of Diane Fischer
421 Degraw Street
Brooklyn, New York 11217
(646) 872-3505
diane@dianefischerlaw.com

*Attorneys for Defendant Frank Butselaar*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

FACTUAL BACKGROUND ................................................................................................. 3

    A.    Mr. Butselaar ................................................................................................. 3

    B.    The "DJ Clients" and the "Offshore Structures" Described in the Indictment. ................................................................................................. 4

    C.    The Indictment's Theory of Criminality ................................................ 6

LEGAL STANDARD ................................................................................................. 7

ARGUMENT ................................................................................................. 8

I.    THE INDICTMENT MUST BE DISMISSED BECAUSE IT FAILS TO DESCRIBE WITH PARTICULARITY THE LEGAL DUTY THAT WAS ALLEGEDLY VIOLATED BY MR. BUTSELAAR. ................................. 8

II.    THE INDICTMENT MUST BE DISMISSED BECAUSE IT FAILS TO ALLEGE THAT MR. BUTSELAAR WAS AWARE OF THE TAX PROVISIONS THAT WERE ALLEGEDLY VIOLATED AND THE OFFENSES IN THE INDICTMENT REQUIRE A WILLFUL VIOLATION. .............. 18

CONCLUSION ................................................................................................. 19

# TABLE OF AUTHORITIES

**Cases**

*Aldridge v. Comm'r of Internal Revenue,*
 T.C.M. (RIA) 2024-024 (T.C. 2024) ........................................................ 16

*Cheek v. United States,*
 498 U.S. 192 (1991) ....................................................................... 2-3, 18

*Hanson vs. Comm'r of Internal Revenue,*
 42 T.C.M. (CCH), 1731 (T.C. 1981), *aff'd,* 696 F.2d 1232 (9th Cir. 1983) ................... 14

*Keck v. United States,* 172 U.S. 434 (1899) ................................................... 8

*McKenzie Family Estate vs. Comm'r of Internal Revenue,*
 57 T.C.M. (CCH) 834 (T.C. 1984) ........................................................ 14-15

*Nichols v. Comm'r,*
 85 T.C.M. (CCH) 798 (T.C.), *aff'd,* 79 F. App'x 282 (9th Cir. 2003) ......................... 13

*Russell v. United States,*
 369 U.S. 749 (1962) ........................................................................ 8, 17

*Walter v. Comm'r,*
 93 T.C.M. (CCH) 644 (T.C. 2007), *aff'd,* 286 F. App'x 445 (9th Cir. 2008) .................. 10

*United States v. Abboud,*
 438 F.3d 554 (6th Cir. 2006) ................................................................ 18

*United States v. All Assets Held at Bank Julius, Baer & Co.,*
 480 F. Supp. 3d 1 (D.D.C. 2020) ............................................................ 12

*United States v. Bok,*
 156 F.3d 157 (2d Cir. 1998) ................................................................ 18

*United States v. Irvine,*
 511 U.S. 224 (1994) ........................................................................ 12

*United States v. Pirro,*
 212 F.3d 86 (2d Cir. 2000) ........................................................ 7-10, 17, 19

*United States v. Regan,*
 937 F.2d 823 (2d Cir. 1991) .............................................................. 2, 18

**Other Authorities**

Bogert's The Law of Trusts and Trustees § 268 ........................................................................ 16

2 Wayne LaFave and Jerold H. Israel, Criminal Procedure § 19.2 (1984) ..................................... 8

Defendant Frank Butselaar respectfully submits this memorandum of law in support of his motion to dismiss the Indictment.[1]

## PRELIMINARY STATEMENT

The Indictment in this case charges Mr. Butselaar—a Dutch tax attorney who worked as a partner for many years in Greenberg Traurig's Amsterdam office—with conspiring to commit a tax fraud scheme that would inure to the benefit of two Dutch disc jockeys, who were temporarily living in the United States and thus, subject to U.S. taxes. The Indictment includes no allegation of any financial benefit for Mr. Butselaar, nor any explanation as to why he would conspire to commit tax fraud on behalf of these two clients, rather than the hundreds of other clients that Mr. Butselaar has represented over the course of his career. Instead, the bare-bones Indictment states only that the criminal law was violated because when the disc jockeys temporarily became residents of the United States, the income tax returns they filed with the Internal Revenue Service did not report monies associated with certain foreign trusts, which in turn held the stock of certain foreign corporations. The Indictment, however, is silent as to what provision or provisions of the Internal Revenue Code required that these monies be reported on the disc jockeys' U.S. tax returns and in fact, there are various and myriad theories of taxation that could have been presented to the indicting grand jury. As explained below, each of these theories involves different provisions of the Tax Code and would require a different defense from Mr. Butselaar at trial. As such, the Indictment's utter failure to describe the specific provision of the Tax Code that the grand jury concluded was violated by Mr. Butselaar creates significant due process concerns and militates the Indictment's dismissal.

---

[1]   We respectfully request the Court's permission to file a subsequent motion for relief should any issues arise relating to the Government's disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. On April 30, 2024, undersigned counsel sent the Government a formal demand for the disclosure of all such material, or to confirm that none exists, within a period of time that has not yet fully elapsed.

The omission from the Indictment of any citation to the IRS provision that purportedly requires the reporting that the Government accuses Mr. Butselaar of conspiring to evade is not a mere technicality. It places Mr. Butselaar's Sixth Amendment right to be adequately informed of the nature of the accusation against him in jeopardy and makes it nearly impossible for Mr. Butselaar to prepare a defense to the Government's allegations. Because the Indictment does not describe which IRS rule he allegedly violated, Mr. Butselaar cannot defend himself by showing that such rule did not apply to the funds at issue or alternatively, by showing that the rule, was in fact, complied with. Because the Indictment does not inform Mr. Butselaar of the "legal duty" that he allegedly violated, Mr. Butselaar cannot prepare a defense based on the argument that he had no awareness of the tax provision at issue, or, if he did have an awareness, that he understood the rule to mean something different from the Government's interpretation—both complete defenses in a criminal tax case. *See Cheek v. United States*, 498 U.S. 192, 199-201 (1991); *United States v. Regan*, 937 F.2d 823, 826 (2d Cir. 1991).

The few details that are contained in the Indictment—the assertion that the foreign corporations were "beneficially owned" by the disc jockeys or the claim that Mr. Butselaar installed "nominee beneficiaries" for the foreign trusts—are generic and subject to various potential meanings, which further confirms that the Indictment lacks the "particularity" that both the Supreme Court and the Second Circuit require in an indictment for criminal tax charges. In short, because the Indictment against Mr. Butselaar is written so broadly and with such an absence of particularity, Mr. Butselaar cannot begin to attack the Government's theory of illegality— because he does not know what that theory is.  In such circumstances, courts, including the Second Circuit, have found the indictment defective and required dismissal.

For much the same reason, it is plain that the Indictment fails to state an offense, as it does not properly allege that Mr. Butselaar "willfully" committed the charged offenses. Supreme Court precedent makes clear that in criminal tax cases, the Government must prove "willfulness," meaning that the Government is obligated to allege that "the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty." *Cheek*, 498 U.S. at 201. While the Indictment here summarily alleges that Mr. Butselaar acted "willfully," the Indictment's lack of any description of the "legal duty" allegedly violated strips the assertion that Mr. Butselaar acted "willfully" of any meaning. An indictment cannot properly allege "willfulness" without first specifying the legal duty that the defendant is purported to have "intentionally and knowingly" violated. Because no such duty is identified in the Indictment against Mr. Butselaar, the Government's allegation of willfulness fails as a matter of law.

The Indictment should be dismissed.

## FACTUAL BACKGROUND

### A.    <u>Mr. Butselaar</u>

Mr. Butselaar is 64 years old and a citizen and resident of the Netherlands. He and his wife, Annemarieke, have four children between the ages of 25 and 30. Since 1986, Mr. Butselaar has practiced as a tax lawyer in the Netherlands.[2] During the period described in the Indictment,

---

[2]    Although the Indictment contains a bewildering implication that Mr. Butselaar was engaging in some type of deception when he "referred to himself as a tax lawyer," *see* Ind. at ¶ 2(a), because, according to the Indictment, "he was not an attorney in any jurisdiction," *see id.*, in fact, Mr. Butselaar *was* a "tax lawyer" and it is unclear what point Paragraph 2 of the Indictment is attempting to make. Unlike in the United States, in the Netherlands, the term "tax lawyer" is a special designation, available only to those who have completed a degree in tax law at an accredited Dutch university—a degree which took 5.5 years when Mr. Butselaar was a student—followed by completion of a three-year course with the Dutch Association of Tax Lawyers. To the extent that Mr. Butselaar ever referred to himself as a "tax lawyer," he did so correctly, as he obtained his degree in Dutch tax law from the University of Leiden in 1986 and, thereafter, completed the required course with the Dutch Association of Tax Attorneys.

Mr. Butselaar was a "shareholder" at international law firm Greenberg Traurig, a title which is synonymous with being a "partner" at the firm. Mr. Butselaar worked in the Tax Department of Greenberg Traurig's Amsterdam office from approximately April 2005 through December 2013. In January 2014, Mr. Butselaar left Greenberg Traurig for a Netherlands-based law firm, Certa Legal, where he continued to practice tax law until 2016. Mr. Butselaar is not trained in U.S. law, did not attend any American law schools, and never practiced as a tax attorney in the United States. He has never prepared, signed, or filed any tax returns with the IRS, on behalf of any client.

### B.       The "DJ Clients" and the "Offshore Structures" Described in the Indictment.

Over the course of his career, Mr. Butselaar has worked with hundreds of clients. The Indictment is premised on the theory that in 2012, after more than 25 years of practicing law, Mr. Butselaar decided to engage in criminal activity—with apparently no encouragement from any clients nor any alleged benefit for himself—in order to save two Dutch disc jockeys from having to pay a full tax bill to the IRS. These two DJs—Tijs Verwest (performing as "Tiesto" and identified in the Indictment as "Client-1") and Nick van de Wall (performing as "Afrojack" and identified in the Indictment as "Client-2") (together, the "DJ Clients")—are, like Mr. Butselaar, Dutch citizens.

Paragraph 4 of the Indictment alleges that "on the advice" of Mr. Butselaar, both DJ Clients—who were, at the time, also residents of the Netherlands—"established" a foreign trust. *See* Ind. at ¶ 4. The Indictment states that these trusts "held" the shares of certain foreign corporations which—to use the words of the Indictment—"collected" "income" "generated" by the DJ Clients. *Id.* To the extent it is helpful to the Court, we show below a visual depiction of the structure described in the Indictment:

4



Although the Indictment's description implies that there was something nefarious about this structure, it is, in fact, the ordinary practice of artists and entertainers throughout the world to utilize corporations to serve as the contracting entity for their performances and other services, precisely as the DJ Clients did here. *See* Ex. 1 (George G. Short, *The Loan Out Corporation: Tax Planning for Entertainers*, 44 Law and Contemporary Problems 51-78 (Fall 1981)) ("successful entertainers commonly furnish their personal services through a vehicle known as a 'loan-out corporation.'); *see also* Ex. 2 (Aaron J. Moss & Kenneth Basin, *Copyright Termination and Loan-Out Corporations: Reconciling Practice and Policy*, 3 Harv. J. Sports & Ent. L. 55, 72 (2012) ("loan-out corporations have achieved near-ubiquity in the entertainment industry: they have been broadly adopted by talent in multiple fields and are even a regular topic in mass-market entry-level texts about the industry"); Ex. 3 (*Excerpt of IRS Audit Manual*) (page 1, page 48-49) ("Many entertainers form corporations known as 'loan-outs'. The purpose of the 'loan-out' is to loan out the services of its (usually [but not always] 100%) shareholder.") In such instances, as was the case with both of the DJ Clients, the artist or entertainer serves as an employee of the corporation

and collects a salary for his work. *See* Ex. 1 ("The loan-out arrangement involves two primary contractual relationships. First, the corporation enters into an employment agreement with the entertainer, who agrees to provide his personal services to the corporation in exchange for a fixed or contingent salary. . .Second. . .[the corporation] will contract with promoters, producers and others to furnish (or loan) the services of the entertainer.").[3]

As the Indictment describes, the actual shares of the Foreign Corporations that employed the DJ Clients were held by the Foreign Trusts. Ind. at ¶ 4.[4] The Indictment is silent as to the nature of the Foreign Trusts. The Indictment does not identify the foreign country where the Foreign Trusts were "established," *see id*., or allege which nation's trust law governs the interpretation of the Trusts' documents. The Indictment does not describe whether the Foreign Trusts were revocable or irrevocable, discretionary or not. The Indictment is silent as to whether the Foreign Trusts had trustees, who they were, or what powers were attributed to them. The Indictment does not allege that any distributions—to the DJ Clients or anyone else—were ever made from these Trusts in the years at issue in the Indictment.

### C.    The Indictment's Theory of Criminality

The Indictment alleges that Mr. Butselaar conspired to "defraud the United States" (Count 1) and aided and abetted the preparation of U.S. tax returns for the DJ Clients which were "false and fraudulent as to material matters." (Counts 2 through 6). The Government's description of

---

[3]    The Indictment's assertion that the foreign corporations at issue "collected" "income" "generated" by the DJ Clients, *see* Ind. at ¶ 4, is a strange formulation; a more precise description would be that these corporations *earned revenue* based on the performance of their employees (the DJ Clients), pursuant to contracts executed in the name of the corporation, just like every loan-out corporation.

[4]    Although the Indictment lumps both the corporations and the trusts together, defining them broadly as the "Offshore Structures," *see* Ind. at ¶ 4, that term is too imprecise to be of any use in this Motion. Accordingly, we use "Foreign Corporation(s)" to refer to the entities which employed and paid a salary to the DJ Clients and "Foreign Trust(s)" to refer to the trusts that held the shares of the Foreign Corporations.

Mr. Butselaar's purported criminal behavior is largely limited to a single paragraph—Paragraph 5 of the Indictment—and provides very few details. Nonetheless, we describe it as best we can here.

While the Indictment (correctly) alleges that the stock of the Foreign Corporations was fully "held" by the Foreign Trusts, *see* Ind. at ¶ 4, the Indictment also alleges that the Foreign Corporations (but not the Foreign Trusts) were "beneficially owned" by the DJ Clients. *Id.* The Indictment does not specify what is meant by the term "beneficial own[ership]" of the Foreign Corporations, and as described below, it could mean any number of different things. *See infra* at Point I. The Indictment then proceeds to allege that once the DJ Clients "qualified as U.S. taxpayers," Mr. Butselaar "remov[ed] the DJ Clients as beneficiaries" of the Foreign Trusts and thereafter "install[ed] nominee beneficiaries." Ind. at ¶ 5. The Indictment does not identify the new beneficiaries or describe what relationship (if any) they had to the DJ Clients. The Indictment also does not specify what is meant by the term "nominee beneficiary." In addition, no facts are alleged in the Indictment that would elucidate how the beneficiaries that Mr. Butselaar allegedly "installed" were different from *bona-fide* beneficiaries.

Finally, the Indictment contains a blanket assertion that some unspecified portion of the "Internal Revenue Code" required that the Foreign Trusts and the Foreign Corporations as well as "the income earned" by the DJ Clients "therefrom" be "reported" on the DJ Clients' respective "Form 1040s" but were not. *Id*.

## LEGAL STANDARD

It is the court's obligation, when faced with a motion to dismiss a criminal indictment, to consider whether the "government's theory of liability is legally insufficient." *See United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000). In criminal tax cases, like this one, that obligation requires the court to consider, at the motion to dismiss stage, whether there "exist[s]" a "known legal duty" that required the income alleged to have been misreported to have been reported. *Id.* (agreeing that

the question of whether the government had properly alleged a "legal obligation" to report the income at issue is a "matter of law" to be decided on a motion to dismiss). That is because, as the Second Circuit has explained, criminal tax prosecutions can only "rest on a violation of a clear rule of law." *Id*. at 91 (citing *United States v. Mallas* 762, F.2d 361 (4th Cir. 1985)). Where the "legal duty" to report the income is not described "with particularity," the indictment must be dismissed. *Pirro*, 212 F.3d at 88. Moreover, where a defendant has "object[ed] to the indictment before trial," he is "entitled to a more exacting review of the indictment than [a defendant] who waits until after trial to object." *Id.*

## ARGUMENT

**I.       The Indictment Must Be Dismissed Because It Fails to Describe With Particularity The Legal Duty That Was Allegedly Violated By Mr. Butselaar.**

In *Russell v. United States*, the Supreme Court explained that an indictment which "contains the elements of the offense," but which does not "sufficiently apprise[] the defendant of what he must be prepared to meet" must be dismissed. 369 U.S. 749, 763 (1962). The Second Circuit has been even more specific: in criminal tax cases where the Government has alleged that monies were fraudulently "omitted" from a tax return, as is the case here, *see* Ind. at ¶ 7, "the indictment *must*. . .allege what made the omission. . .criminal." *Pirro*, 212 F.3d at 93 (emphasis added). To satisfy this obligation, the IRS rule that was allegedly violated must be identified in the indictment. *Id.* at 94 ("where an indictment charges a crime that depends in turn on violation of another statute, the indictment must identify the underlying offense.") (citing 1 Charles Alan Wright, Federal Practice and Procedure: Criminal 3d § 124 at 549 (1999)); *see also* 2 Wayne LaFave and Jerold H. Israel, Criminal Procedure, § 19.2 at 452 (1984) ("where the violation of one statute is dependent on defendants' having violated or having intended to violate, some other statute. . .the pleading must identify that additional offense"); *Keck v. United States,* 172 U.S. 434,

437 (1899) (finding indictment insufficient where defendant was charged with smuggling but the indictment did not identify "the statutory regulations concerning the importation of merchandise" that were allegedly violated).

Moreover, the Government is *also* required to include in the indictment sufficient factual details to explain, "with particularity," *why* the IRS rule that the Government claims to have been violated applied to the income at issue. *Pirro*, 212 F.3d at 93 (where the tax returns at issue are alleged to have "omi[tted]" certain income, the indictment must set forth sufficient "background facts" that "give rise to the duty" to report the income that was "omi[tted.]"). The Indictment against Mr. Butselaar fails in each of these respects.

While the Indictment baldly asserts that the Foreign Trusts and the Foreign Corporations as well as "the income earned" by the DJ Clients "therefrom" should have been "reported" on the DJ Clients' respective "Form 1040s, *see* Ind. at ¶ 7, it contains no citation to the IRS Rule that required such reporting. Instead, the most that can be gleaned from the Indictment is that the Government's case against Mr. Butselaar is premised on the contention that funds associated with the Foreign Trusts and the Foreign Corporations were taxable to the DJ Clients. There are, however, perhaps a dozen reasons why the DJ Clients might—or might not—be taxed on the funds associated with the Foreign Trusts and/or the Foreign Corporations.  It is impossible to know, by reading the Indictment, which of these theories of taxation—if any—constituted the basis on which the grand jury indicted Mr. Butselaar.

For example, although the Indictment alleges that the stock of the Foreign Corporations was fully "held" by the Foreign Trusts, *see* Ind. at ¶ 4, the Indictment also, as described above, alleges that the Foreign Corporations were "beneficially owned" by the DJ Clients. *Id*. The Indictment does not cite any IRS provision defining "beneficial ownership" and it is a phrase that

is used in multiple and differing contexts. Second Circuit precedent makes clear that when an indictment in a criminal tax case uses only "generic" terms that lack legal specificity, the indictment is defective. *Pirro*, 212 F.3d at 93 (dismissing count alleging Section 7206(1) violation where the indictment alleged only that defendant failed to disclose to the IRS an "ownership interest" in a particular company, because "ownership interest" is a legally unspecific term and the indictment lacked sufficient factual allegations to otherwise clarify the accusation.) The Indictment's assertion that the Foreign Corporations were "beneficially owned" by the DJ Clients is precisely the type of "generic" allegation that the Second Circuit has deemed impermissible.

It is impossible for Mr. Butselaar to adequately prepare a defense when he does not know whether the Indictment is premised on the traditional concept of a "beneficial owner" with respect to the shares of a corporation—in this case, the shares of the Foreign Corporations—or some other concept. Under this traditional definition, the "beneficial owner" of a stock is the person who has the power to vote or dispose of the stock, even though the shares may be held in another's name. *Walter v. Comm'r*, 93 T.C.M. (CCH) 644 (T.C. 2007), *aff'd*, 286 F. App'x 445 (9th Cir. 2008) (explaining that a "beneficial owner" is one who does not have legal title to the stock but has "rights in the property which are the normal incidents of owning property," including "the right to receive dividends on and vote the shares, the right to dispose of the shares as the beneficial owner sees fit, and the right to use the shares as collateral"). Although the Indictment does not cite any Code provision to this effect, it seems possible that the Code requires a person who has the powers described above to report the earnings from that corporation on his Form 1040 return. If that provision (assuming it exists) is the "legal duty" that the grand jury believed was violated here,

Mr. Butselaar could raise as his defense the fact that the DJ Clients *never* voted or disposed of the stock of the Foreign Corporations, nor had the power to do so.[5]

Alternatively, it is possible that the Government takes the view that any person who served as a "beneficiary" of the Foreign Trusts was also the "beneficial owner" of that Trust's assets—which would include the stock certificates of the Foreign Corporation(s). But even if that is what the Government meant by "beneficial owner" of the Foreign Corporations, it remains unclear what tax obligation would be implicated, since the general rule under the Tax Code is that the "beneficiaries" of a foreign trust are only taxed on *distributions* they receive from the foreign trust, *not* everything that the trust owns. *See* Foreign Trust Reporting Requirements and Tax Consequences, *available at* https://www.irs.gov/businesses/international-businesses/foreign-trust-reporting-requirements-and-tax-consequences ("In general, a U.S. beneficiary receiving a distribution from a foreign non grantor trust will report the *beneficiary's share of the trust's distributable net income* (DNI).") (emphasis added). Nonetheless, if this was the tax rule that formed the basis for the grand jury's indictment, Mr. Butselaar would be able to raise as his defense the fact that *no distributions* from the Foreign Trusts were ever made to the DJ Clients in the years at issue—instead, the DJ Clients lived exclusively off the (sizable) salaries they received as employees of the Foreign Corporations.[6]

The possible theories upon which the Indictment *could* be based do not end there. The Indictment states that the DJ Clients each "established" their respective Foreign Trusts, which in

---

[5]    Paragraph 6 of the Indictment relates to "certain fashion industry clients" of Mr. Butselaar and alleges that that Mr. Butselaar "implemented" a "fraudulent transfer" of these clients' "companies" to family members, "knowing" that these clients would maintain "beneficial ownership" of the companies. No further description is provided, and thus, the use of the phrase "beneficial ownership" in Paragraph 6 is just as generic and unspecific as its use in Paragraph 4.

[6]    We understand that the Government agrees that the *salaries* earned by the DJ Clients from the Foreign Corporations were fully disclosed on the DJ Clients' Form 1040s, and taxes paid in full to the IRS on that income.

turn held the shares of the respective Foreign Corporations. Ind. at ¶ 4. It is possible that the Government takes the view that an individual who "establish[es]" a foreign trust is also the "owner" of the assets of that trust and that is what Paragraph 4 is referring to when it asserts that the DJ Clients "beneficially owned" the Foreign Corporations. If this was the theory that led the grand jury to indict, Mr. Butselaar would be able to defend himself by demonstrating that in Guernsey, where the Foreign Trusts were located, a person who establishes an irrevocable trust— the trust's "settlor"—relinquishes all ownership of the assets held by the trust. *See* Ex. 4 (Affidavit of Gavin Ferguson, Guernsey lawyer, submitted on behalf of the Department of Justice in *United States v. All Assets Held at Bank Julius, Baer & Co*., Case No. 1:04-cv-00798, Dkt, 554-3 at *5-7 (D.D.C. 2015) (explaining that under Guernsey law, the "settlor" of a trust relinquishes his ownership of the property he contributed to the trust). Since it is a fundamental precept of federal tax law that "state law [or foreign law] creates legal interests and rights in property," and federal law only "determines whether and to what extent those interests will be taxed," *United States v. Irvine*, 511 U.S. 224, 238 (1994), Guernsey trust law would be dispositive in demonstrating that the DJ Clients did not become the "beneficial owners" of the stock of the Foreign Corporation simply because they "establish[ed]" the Foreign Trusts which held that stock. *United States v. All Assets Held at Bank Julius, Baer & Co*., 480 F. Supp. 3d 1, 10 (D.D.C. 2020) (under Guernsey law, once an "irrevocable" trust is established, "no one has the power to revoke the trust and have the funds revert to the settlor."). Of course, it is impossible to know if these provisions of Guernsey's trust law are helpful to Mr. Butselaar's defense or not because the Indictment does not specify the theory upon which Mr. Butselaar was indicted.

A fourth possible theory which seems to be implied by the Indictment, although never stated directly, is the argument that the Foreign Trusts were invalid "shams" (for some unspecified

reason) and thus, could not hold the stock of the Foreign Corporations. *See, e.g., Nichols v. Comm'r*, 85 T.C.M. (CCH) 798 (T.C.), *aff'd*, 79 F. App'x 282 (9th Cir. 2003) ("A trust is disregarded for tax purposes if in substance it is no more than a paper entity, a sham lacking any valid purpose other than the avoidance of tax."). To the extent that the grand jury indicted on the basis of a belief that the Foreign Trusts were not "real" Trusts, Mr. Butselaar would have an ample defense, as he could demonstrate that the Trusts were created for the legitimate purpose of shielding the DJ Clients from personal liability in the event of an accident at a concert,[7] had their terms drafted by a team of tax lawyers at Greenberg Traurig, including Thomas Van der Vliet, who remains at the firm and currently serves as the Co-Chair of the firm's Global Tax Practice, were exclusively administered by professional trustees for the *entirety* of the period at issue, and were reviewed by numerous U.S. tax attorneys, including those at Kramer Levin Naftalis & Frankel LLP, and Manatt, Phelps & Phillips LLP. Again, however, it is unclear from the Indictment whether the Government is alleging a "sham trust" theory or, if it is doing so, what IRS rule would thereby place responsibility on the DJ Clients for taxes related to the Foreign Corporations and the other assets of the Foreign Trusts.

Paragraph 5's allegation that Mr. Butselaar "removed the DJ Clients as beneficiaries" of the Foreign Trusts and "install[ed] nominee beneficiaries" once the DJ Clients "qualified as U.S. taxpayers" does not solve, but only exacerbates, these deficiencies in the Indictment. It is entirely unclear what Mr. Butselaar did to "install[] nominee beneficiaries" and the Indictment does not contain a single factual allegation which explains how the beneficiaries that Mr. Butselaar allegedly "install[ed]" were any different from non-"nominee" beneficiaries. The Tax Code does

---

[7] Both DJ Clients specialize in a genre of music known as "electronic dance music" and their performances routinely inspire intense physical participation from attendees, including body surfing, moshing, and the similar conduct. The possibility of serious injury to a fan is not a remote concern.

not define what it means to be a "nominee" beneficiary of a trust, foreign *or* domestic. When counsel searched for that phrase—"nominee beneficiar!" through the entire Lexis-Nexis and Westlaw databases of U.S. Tax Court cases, not a single case was returned. When counsel expanded the search to include the phrase "nominal," rather than "nominee," only two cases were returned that appeared at all on point, and in each, it was quite clear from the opinion what the Tax Court meant by a "nomin*al* beneficiary." *See Hanson vs. Comm'r of Internal Revenue*, 42 T.C.M. (CCH), 1731 (T.C. 1981), *aff'd*, 696 F.2d 1232, 1233 (9th Cir. 1983); *McKenzie Family Estate vs. Comm'r of Internal Revenue*, 57 T.C.M. (CCH) 834 (T.C. 1984).

     *Hanson* involved a married couple in rural Oregon who attempted to set up a "family estate trust" pursuant to step-by-step instructions they had received through the mail from a quasi-religious sect. *Id*. at 1732. The couple transferred all of the family's property, including the family home, into the trust. *Id*. at 1735. The couple, along with a family friend who had no experience as a trustee or financial advisor, were named as trustees. *Id*. at 1732, n. 6. The husband and wife were both beneficiaries of the trust, alongside their children and the family friend. *Id*. at 1735. Having set up the trust in this manner, the couple then proceeded to "use[ ] and enjoy[] all the property purportedly conveyed" to the trust "just as they had used and conveyed it before" the trust was set up. *Id*. All "personal expenses" of the family were either "paid out of a checking account opened in the name of the Trust" or were paid by the couple "with funds removed from [the checking account] and characterized at year's end as 'consulting fees.'" *Id*. When the couple ultimately divorced, they divided the "trust corpus" "between themselves" without any allocation to their children or the family friend, who were also named as beneficiaries. *Id*. at 1737, n. 19. Given these facts, the Tax Court, in footnote 9 of its opinion, referred to the children and the family friend as "nominal beneficiaries." *Id*. at 1735, n. 9.

*McKenzie* is similar. It also involved a married couple who attempted to set up a "family trust" to which they transferred their Wisconsin home, land they owned in Colorado, certain insurance policies and other "personal property." 42 T.C.M. at 835-36. While the indenture associated with the "family trust" empowered the trustees to make all distributions "in their discretion," the trustees were *not* independent professionals but rather, were the married couple and their adult son. *Id*. at 836. A few years after this "family trust" was created, the married couple set up two *more* trusts and these two supplementary trusts each received "50 units of beneficial interest" in the original "family trust." *Id*. During a hearing in front of the Tax Court, the wife testified that these supplementary trusts "served merely as a conduit to pass receipts" from certain customers of the family's business back to the "family trust." *Id*. at 839. When the couple filed tax returns on behalf of the "family trust," they "deducted as administrative expenses the costs of utilities, insurance, telephone service, and repairs" to their personal residence, as well as the couple's medical, travel and entertainment expenses. *Id*. at 838. In a single sentence in the opinion, the Tax Court noted that even though the two supplementary trusts were the "nominal beneficiaries" of the family trust, those trusts never received any distributions and were instead used "merely as a conduit" to funnel money back to the "family trust," where it was then used by the married couple to finance their general lifestyle. *Id*. at 838-39. On these facts, the Tax Court found that the "family trust" qualified as a "grantor trust' under Section 674(a) of the Tax Code because the couple, as trustees, had the power to "distribute trust income and proceeds in their discretion." *Id*. As such, the married couple should have reported the income from the family trust on their personal tax returns.

The Indictment here, unlike the Tax Court's opinions in *Hanson* and *McKenzie*, contains no factual details to illuminate the meaning of the phrase "nominee beneficiaries." The Indictment does not describe any distributions that should have been made to these beneficiaries but weren't— and given that Foreign Trusts were administered by professional trustees with fiduciary obligations to the beneficiaries, it seems unlikely that any such allegation could be made. *See Aldridge v. Comm'r of Internal Revenue*, T.C.M. (RIA) 2024-024 (T.C. 2024) (the existence of an "independent trustee" is a meaningful factor in determining the economic validity of a trust). There is no allegation that the DJ Clients ever distributed (or had the power to distribute) trust proceeds to themselves, for living expenses or anything else. The Indictment is entirely silent as to a single right or power that should have been granted to the beneficiaries that Mr. Butselaar allegedly "installed," but which was instead denied to them.  In short, the Indictment's complete failure to describe how these beneficiaries differed from *bona fide* beneficiaries makes it impossible for Mr. Butselaar to defend himself, because he does not know what he is defending himself against.

Moreover, even accepting for argument's sake, that the beneficiaries allegedly "installed" by Mr. Butselaar were improper in some (unspecified) way, the Indictment fails to explain how that would result in a tax liability for the DJ Clients. As described above, the "general rule" for the taxation of trust income, as reflected in treatises on trust law, is that "the beneficiary is liable for taxes on trust income *that is distributed* or that is distributable to the beneficiary and the trust is liable for taxes on trust income that is retained in the trust and that is not distributed or distributable to the beneficiary." *See* Bogert's The Law of Trusts and Trustees, Ch. 15 ("Trusts and Problems of Taxation"), § 268 (emphasis added). The Indictment contains no allegation of *any* trust distributions, to the DJ Clients, to the "nominee" beneficiaries, or otherwise. However, no other IRS provision is cited that would explain how the installation of these "nominee" beneficiaries

resulted in an unmet tax obligation for the DJ Clients. This complete lack of particularity is wholly insufficient under binding Second Circuit precedent. *Pirro*, 212 F.3d at 93 (where an indictment fails to set forth sufficient "background facts" that "give rise to the duty" to report the income that was allegedly "omi[tted]" from the tax return, the indictment is defective and must be dismissed).

In *Russell*, the Supreme Court explained *why* an indictment that looks like the one brought against Mr. Butselaar is so offensive to our criminal justice system. When an indictment fails to describe the specific theory of criminality that served as the basis for the Government's accusation against the defendant, the trial judge, because he or she has not been provided with the Government's specific theory of criminality, cannot "intelligently" decide whether "the facts alleged are sufficient in law to withstand a motion to dismiss the indictment." *Id*. at 768-69. That concern is even more heightened in criminal tax cases, due to the "esoteric" nature of federal tax law, which is "replete with full-grown intricacies." *Pirro*, 212 F.3d at 91 (citing *Regan*, 937 F.2d at 827). Moreover, to the extent that the defective indictment is not dismissed at the pleading stage, the prosecution is thereafter able to benefit from its lack of specificity, as it is then "free to roam at large—to shift its theory of criminality so as to take advantage of each passing vicissitude of the trial and appeal." *Russell*, 369 U.S. at 768. These are precisely the type of errors that the Sixth Amendment's Indictment Clause is designed to guard against. *Id.* at 761 (the "guaranty of the Sixth Amendment" is that in "all criminal prosecutions, the accused shall enjoy the right to be informed of the nature and cause of the accusation"). Because the Indictment against Mr. Butselaar lacks the specificity that is constitutionally required, and fails to "sufficiently apprise[]" Mr. Butselaar of "what he must be prepared to meet," the Indictment is defective. *Id*. at 763. It must be dismissed.

**II.      The Indictment Must Be Dismissed Because It Fails to Allege that
             Mr. Butselaar Was Aware of the Tax Provisions That Were Allegedly
             Violated and the Offenses In the Indictment Require a Willful Violation.**

It is well-established that in the area of federal taxation, only "willful" violations are subject to criminal punishment. *See, e.g., Cheek*, 498 U.S. at 199-201; *see also United States v. Bok*, 156 F.3d 157, 165 (2d Cir. 1998) ("Both [Section] 7201 and [Section] 7206(1) require that the government prove that the defendant acted willfully."); *Regan*, 937 F.2d at 827 (the Government's obligation to prove a willful violation of the tax laws "also applies to 18 U.S.C. § 371 conspiracies to violate one or more of the hierarchy of tax offenses"). In other words, "the common-law presumption that every person knows the law does *not* apply where violations of federal criminal tax laws are alleged." *Regan*, 937 F.2d at 827 (citing *Cheek*, 498 U.S. at 200-201) (emphasis added). Instead, in criminal tax cases, the Government must prove that "the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty." *Cheek*, 498 U.S. at 201. Or, as the Sixth Circuit has explained "tax law is one of the few areas where the Supreme Court has held that ignorance of the law is a defense." *United States v. Abboud*, 438 F.3d 554, 582 (6th Cir. 2006).

The Indictment against Mr. Butselaar must be dismissed because it does not allege "willful" conduct by Mr. Butselaar. While the Indictment summarily includes the word "willful" in each description of Counts 1 through 7, that reference to the Government's requirement to prove *mens rea* is insufficient to sustain the Indictment, because the Indictment is completely silent as to what "legal duty" Mr. Butselaar "willfully" violated. As described at length in Section I above, there are numerous and myriad reasons why the DJ Clients might have—or might not have—been required to pay taxes associated with the Foreign Trusts and the Foreign Corporations. Each of those theories of taxation implicates different provisions of the Tax Code. As such, the Government cannot allege a "willful" violation by Mr. Butselaar unless it also alleges which

provisions of the Tax Code imposed the "legal duty" that formed the basis for Mr. Butselaar's indictment. *See Pirro*, 212 F.3d at 91 (where the Government failed to allege a specific "known legal duty" in the Indictment, the Government could not have alleged "willful conduct" since "willfulness requires a voluntary intentional violation of a known duty."). For this reason too, the Indictment must be dismissed.

**CONCLUSION**

Accordingly, this Court should order the dismissal of the Indictment against Mr. Butselaar.

Dated:   New York, New York
         May 31, 2024

Kerry A. Lawrence

Kerry Lawrence
Law Office of Kerry Lawrence PLLC
140 Grand Street
Suite 705
White Plains, NY 10601
(914) 946-5900
kerry@kerrylawrencelaw.com

Diane Fischer
Law Office of Diane Fischer
421 Degraw Street
Brooklyn, New York 11217
(646) 872-3505
diane@dianefischerlaw.com

*Attorneys for Defendant Frank Butselaar*