**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

UNITED STATES OF AMERICA

       v.

FRANK BUTSELAAR,
             *Defendant.*

Case No. 22 Cr. 560 (CS)

 

**DEFENDANT FRANK BUTSELAAR'S SECOND MEMORANDUM OF FACTS**
**AND LAW IN RESPONSE TO THE GOVERNMENT'S MOTIONS *IN LIMINE***

Kerry A. Lawrence
LAW OFFICE OF KERRY LAWRENCE PLLC
140 Grand Street, Suite 705
White Plains, New York 10601

Diane M. Fischer
LAW OFFICE OF DIANE FISCHER
195 Plymouth Street
Brooklyn, New York 11201

Samidh Guha
GUHA PLLC
1740 Broadway, 15th Floor
New York, New York 10019

*Attorneys for Defendant Frank Butselaar*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ........................................................................................................... 7

I.     The Court Should Not Admit Evidence of Other Professionals, Including Lawyers, Advising Butselaar That His Schemes Were Contrary to Law ...............................................................................7

II.    The Court Should Preclude Evidence Regarding "Control" of the Offshore Structures as Irrelevant .....................................................10

     A.    Evidence Purporting to Demonstrate That the DJ Clients "Controlled" Their Performances and Business Endeavors Is Irrelevant and Should Not Be Admitted ...................................11

     B.    The Court Should Preclude Evidence of the DJ Clients' Use of the Offshore Structures to Make Personal Investments........................15

     C.    The Court Should Preclude Evidence that the Trustee Witness (████) and Cypriot Witness (████████) Were Managing the Offshore Structures to Benefit the DJ Clients ...................18

III.    The Court Should Deny the Government's Motion to Introduce Evidence Demonstrating ████ and ██'s "Motive" to Join the Alleged Conspiracy.............................................................................20

IV.    Butselaar Does Not Object to the Introduction of Reputation Evidence for the Specific Purposes Cited by The Government; Similarly He Should Be Permitted to Introduce Evidence of His Personal Circumstances .........................................................................23

CONCLUSION........................................................................................................ 23

# TABLE OF AUTHORITIES

**Cases**

*Arlio v. Lively*,
  474 F.3d 46 (2d Cir. 2007) ................................................................................. 12

*Cheek v. United States*,
  498 U.S. 192 (1991) .......................................................................................... 13

*Davis v. City of New York*,
  959 F. Supp. 2d 427 (S.D.N.Y. 2013) ................................................................ 7

*Framatome Connectors U.S., Inc. v. Comm'r*,
  108 F. App'x 683 (2d Cir. 2004) ...................................................................... 12

*Sargent v. Comm'r*,
  929 F.2d 1252 (8th Cir. 1991) .......................................................................... 15

*United States v. Bilzerian*,
  926 F.2d 1285 (2d Cir. 1991) ............................................................................. 9

*United States v. Dupree*,
  706 F.3d 131 (2d Cir. 2013) ............................................................................... 9

*United States v. Graziano*,
  558 F. Supp. 2d 304 (E.D.N.Y. 2008) ............................................................. 22

*United States v. Martinez*,
  54 F.3d 1040 (2d Cir. 1995) ............................................................................. 21

*United States v. Pauling*,
  924 F.3d 649 (2d Cir. 2019) ....................................................................... 15, 16

*United States v. Peterson*,
  808 F.2d 969 (2d Cir. 1987) ............................................................................. 21

*United States v. Pinckney*,
  85 F.3d 4 (2d Cir. 1996) ............................................................................. 15, 16

*United States v. Stewart*,
  433 F.3d 273 (2d Cir. 2006) ............................................................................. 22

*United States v. Tsarnaev*,
  595 U.S. 302 (2022) ............................................................................................ 8

*United States v. Ulbricht,*
    79 F. Supp. 3d 466 (S.D.N.Y. 2015)......................................................................... 22

**Rules, Statutes, and Regulations**

26 C.F.R. § 1.957-1 ............................................................................................................ 12, 13

Fed. R. Evid. 401 ............................................................................................................... 19

Fed. R. Evid. 403 ............................................................................................................... 8

Fed. R. Evid. 801(d) ........................................................................................................ 7, 8

Fed. R. Evid. 805 ............................................................................................................... 8

I.R.C. § 677 ........................................................................................................................ 19

Defendant Frank Butselaar respectfully submits this second memorandum of facts and law in response to the Government's Motions *in Limine* ("Mem."), filed August 30, 2024.

## PRELIMINARY STATEMENT

The Government's Superseding Indictment of Butselaar achieves the rare feat of having not one, but two Achilles' heels. Butselaar, in his September 23, 2024 submission responded to approximately half of the Government's motions *in limine* arguments and refuted the Government's effort to improperly shape trial evidence to hide its anticipated failure to prove the requisite *mens rea* element of its charges. In this submission, Butselaar challenges the remaining Government's motions *in limine* which at a macro level seek to obscure the crucial absence of any finding by a competent regulatory body that Butselaar violated any legally cognizable duty in providing the tax guidance at the heart of the Government's Superseding Indictment. Instead, the Government seeks with these motions to introduce an array of irrelevant and inadmissible evidence to distract from its fatally flawed prosecution. The Government may not take such liberties and, therefore, its substantive remaining motions should be denied.

As a threshold matter, there is no dispute that the Government must demonstrate that a legal duty has been violated by Butselaar in connection with the filings to the Internal Revenue Services ("IRS") by the taxpayers in question. Buried on page 23 of its sprawling and oddly granular pre-trial submission addressing evidence not yet offered, the Government acknowledges this core element of proof, stating that:

> In order to prove the various false subscription counts in the Indictment, the Government, of course, must prove that Butselaar willfully violated a known legal duty. But underlying that element is the foundational requirement that the Government must prove that a legal duty was, in fact, violated.

Mem. at 23. This requirement does not solely govern the substantive counts in the Superseding Indictment as the Government suggests. In the conspiracy count, the Government must equally demonstrate that Butselaar agreed with others to knowingly defraud the Government by interfering with its collection of tax proceeds lawfully owed to it. To qualify as unlawful, the Government must first establish that Butselaar knew beyond a shadow of a doubt that the taxpayers had a duty, pursuant to the Internal Revenue Code ("IRC") sections referenced in the Superseding Indictment, to report certain income for purposes of taxation and then willfully sought to prevent such reporting to the Government.

Nowhere in the Government's Superseding Indictment, the discovery to date, or the evidence cited in its motions *in limine* does the Government cite any finding by any U.S. tax authority that the taxpayers — let alone Butselaar — actually violated any known legal duty. The Government's brief is replete with conclusory allegations that the tax structures proposed by Butselaar allowed the taxpayers to improperly evade payment of taxes on certain income. However, the IRS, in its only apparent review of any of the structures that are the subject of the Government's charges here, never concluded that there had been a violation with respect to the Trusts. (Ex. B, the IRS Examining Officer's Report).

Tellingly, the Government is seeking instead to *preclude* the IRS's analysis and findings. The Government cannot deny the inconvenient truth that neither the IRS nor any tax court has judged Butselaar or the advice that is the subject of this indictment to have been illegal. The Government sheepishly offers a spate of thin excuses in its attempt to explain away the IRS's audit and resulting inaction:

> Rather, the IRS's decision was driven by the complexity of the issues, the onset of the global COVID-19 pandemic and the associated operational issues that caused, and resource prioritization needs.

Mem. at 52. In doing so, the Government in fact makes an extraordinary concession. The Government acknowledges in its own words that the issues were too "complex[ ]" for the IRS to divine any willful failures by the DJ Client taxpayers with respect to their foreign Trusts, but yet maintains in this prosecution that Butselaar must be held *criminally* responsible for his advice.[1]

The failure to identify the violation of any legal duty by the IRS, a U.S. Tax Court, or any other qualified government regulator should be the vantage point from which to consider the Government's motions *in limine* addressed here.

*First*, the Government seeks to introduce the testimony of a select few lay witnesses who opined on "complex[ ]" issues that the IRS deliberated over for approximately 18 months without ever reaching a conclusion. Notwithstanding the remarkable claim that these individuals are better positioned to assess the legal duties satisfied or violated than the IRS, the prospective Government witnesses have even less information than would be available to the IRS. The Government concedes that "[a]fter reviewing the documents, two partners at [Kramer Levin] advised Butselaar and others that [████████'s] Offshore structure *appeared* to be reportable under U.S Grantor Trust rules," thereby avoiding a dispositive conclusion. Mem. at 10 (emphasis supplied). Yet another proposed Government witness relied upon heavily by the Government acknowledged in his email guidance regarding Butselaar's proposed tax vehicles that "the above [email observations]

---

[1] Although Butselaar's response to the Government's motions primarily discusses the 2016 IRS audit of ████████'s tax returns, which was notable for its length and the detail of its inquiry, ████████'s corporate structures shared the same "architecture" and functions as ████████'s. In addition, the IRS audited ████████'s U.S. tax returns for the 2015 tax year (Count Four of the Superseding Indictment) and only identified additional tax due from the sale of an apartment in Amsterdam. The IRS required no revisions to be made to the return, assessed no penalties, and, because ████████ had in fact overpaid that year, it applied the additional tax due in the amount of $15,080 to the overpayment. While the IRS did not perform any audits of the Fashion Industry Clients, whose tax filings and circumstances should not be admissible in this litigation), the Fashion Industry Clients did not employ the use of a foreign trust, and the filings of their U.S. tax returns do not underlie any of the substantive tax counts.

represents my initial thoughts based upon a brief review of the memos and emails. I would be happy to discuss them further, but to provide definitive advice, I would need to spend more time fully understanding the foreign structures, income flows, etc." Mem. at 14 (████ email). In attempting to elevate these lay observations, the Government seeks to introduce these incomplete samplings of viewpoints to have the jury undertake the work that the Government deemed too "complex[ ]" for the IRS and for its unfairly prejudicial value.

Perhaps even more incredulous, the Government contends that it is not offering the lay testimony of these witnesses for the "truth." This proposition blinks reality. The Government is offering this testimony, improper, and limited in value though it may be, for the truth. It seeks to present to the jury not only that Butselaar had "knowledge" of these issues, as it claims, but knowledge that its witnesses disagreed with Butselaar and therefore a jury may conclude that Butselaar's advice — contrary to the substantive views of the Government's witnesses — was legally infirm. The Government's strained efforts to shoehorn the proposed witness testimony into a hearsay exception fails and, therefore, the Government's motion to permit this testimony as described should be denied.

*Second*, the Government's acknowledgment that the "complexity of the issues" proved too much for the IRS to render a determination on lawfulness also undermines the Government's efforts now to introduce into evidence select aspects of the tax structures proposed by Butselaar. The Government moves *in limine* for permission to present evidence to support its arguments that under the entities in question (a) the taxpayers on the advice of its professionals made personal investments through these vehicles; (b) the taxpayers' trustee and business managers managed the foreign entities for the benefit of the taxpayers; and, (c) the taxpayers controlled their performances and business endeavors in a manner that had an impact on the tax treatment of the commonly-used

"loan out" agreements in the entertainment field. There is no indication as to if, how, or how much the IRS would or in fact did weigh any of this evidence in considering the "complex[ ]" determination as to the lawfulness of the structure under the fact-specific circumstance. There is no indication that the prosecution team's analysis of the legal import of this evidence is accurate or that the prosecution team's introduction of this evidence would complete the information needed by the IRS to make a determination. Rather, by all measures, the jury, who undoubtedly will not possess the requisite expertise to make such determinations, will have substantially less information and time to make this determination.[2]

As but one example, the Government argues in its motions that the taxpayers' employment contracts required them under the agreement to "'obey and conform to all lawful instructions and directions' of the boards of directors of their companies." Mem. at 24-25 (citing Exhibit 26). The Government states the obvious – the taxpayers being the "talent" made choices as to the details of their performances – but conspicuously omits any allegation that the taxpayers did not "obey and conform to all lawful instructions and directions" from their respective boards of directors. What impact this fact pattern has on the IRS's or any other competent regulator as to taxability is certainly beyond the purview of the prosecutorial team, let alone the jury. The same is true for the other select aspects of the tax structures on which Butselaar offered guidance that the Government seeks to introduce. Such testimony is incomplete and inconclusive as to any real issue of lawfulness and duty and will undoubtedly be confusing to the jury.

---

[2] The Rule 16 discovery related to the 2016 IRS audit of ███████'s 2013 and 2014 tax returns contained more than 1,600 documents and, on September 27, 2024, at 4:30 p.m. — only two days ago — the Government produced over 4,000 pages of tax returns related to nine individuals and entities.

*Third*, the Government seeks to introduce evidence of ███'s and ███'s knowledge of the alleged conspiracy's purpose and their motivation to join the alleged conspiracy. This request seems extraordinarily premature. The Government has not proven that the alleged conspiracy exists, a point that has special resonance here where the industry of tax guidance and preparation is presumptively legal. Seeking to introduce evidence of uncharged tax professionals' knowledge and motivations is both conclusory and presumptuous and has the real possibility of improperly biasing the jury in its consideration of the charges against Butselaar. It also bears note that the Government's refusal — even at this late date — to identify other potential co-conspirators among its witnesses further complicates these and other evidentiary matters.

The objections posed by Butselaar are fundamental to the fairness of this trial and the Government must be held to the highest standards in pursuing this prosecution. As in the earlier tranche of motion *in limine* responses, Butselaar does not reflexively oppose every one of the Government's motions. At this time, Butselaar does not object to the Government's efforts to offer the limited evidence of his reputation and to preclude certain evidentiary subjects identified in its motion by the Government, including evidence relating to his extradition or potential sentence.[3]

In sum, the Government's remaining motions *in limine* also raise grave questions about the nature and propriety of its prosecution of Butselaar. These are unconventional and unsupported motions from the Government in an unconventional prosecution. The Government's effort to curate the evidence to its advantage paired with its continuing failure to identify the precise duty that it contends Bustelaar violated increases the risk that Butselaar may well be subject to trial by ambush or worse yet, trial in absence of actual criminal exposure.

---

[3] Butselaar reserves the right to raise objections to any other yet unspecified evidence related to his reputation or background that the Government may seek to introduce at trial.

## ARGUMENT

**I.    The Court Should Not Admit Evidence of Other Professionals, Including Lawyers, Advising Butselaar That His Schemes Were Contrary to Law**

The Government seeks to admit evidence that a "litany of professionals" told Butselaar that the Trust income was reportable to the IRS not for its truth, but alternatively as either evidence of notice, evidence of a conspiracy, as circumstantial evidence of knowledge, or to contextualize Butselaar's actions. The impropriety of the Government's strategy is plain to see. As discussed in Butselaar's September 23rd response, the Government wrongly seeks to preclude competent evidence from the IRS of its 18-month long investigation of these issues and 2016 culminating report, which did not pursue regulatory action against the taxpayers, let alone Butselaar. Instead, the Government seeks to substitute the lay testimony of a narrow group of professionals (the "Lay Professionals"), who lacked the IRS's knowledge of the particulars of the taxpayer's business and tax affairs, had no authority to make any binding determinations of the tax structure's lawfulness, and readily admitted the cursory nature of their observations.

The Government's gambit fails for fundamental evidentiary reasons. The Government's effort in Point III(B)(1) to introduce documents between and among the Lay Professionals and third parties constitute hearsay, oftentimes at multiple levels. As the Court is well aware, Rule 801(c) defines hearsay as a "declarant's out-of-court statement 'offer[ed] in evidence to prove the truth of the matter asserted in the statement." *See Davis v. City of New York*, 959 F. Supp. 2d 427, 434 (S.D.N.Y. 2013). A declarant's prior statement will be precluded as hearsay unless "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is ... consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." Fed. R. Evid. 801(d).

Each of the documents identified in the Government's motion fails this hearsay analysis. First, the 2012 email communication involving ████████ and Bustelaar should be precluded as hearsay and under FRE 403. Although the Government has not confirmed which of the 39 witnesses for which it has provided 3500 materials will testify at trial, there is good reason to believe that ████ is not among them. Absent his testimony, there is "no way to confirm or verify the relevant facts underlying the evidence" and the probative value of the email, regardless of the proffered purpose, is substantially outweighed by its prejudice to Butselaar. *See United States v. Tsarnaev*, 595 U.S. 302, 318 (2022).

The Government similarly seeks to introduce testimony and documents from ████ ████ regarding advice that she and other Greenberg Traurig tax partners purportedly conveyed to Butselaar, which the Government argues is not for the truth but evidence that Butselaar was put on notice of Greenberg Traurig's views on the relevant tax structures. First, ████ may not relay to the jury, through testimony or documents, the content of any opinions or advice offered to her by other members of Greenberg Traurig's tax group. Such testimony would constitute double hearsay and is therefore inadmissible. *See* Fed. R. Evidence 801(d)(1)(A), 805. Moreover, the Government's contention that the advice is not to be taken for its truth is disingenuous. Butselaar's mere awareness of Greenberg Traurig's "views" is wholly irrelevant to whether or not he willfully violated a known legal duty.  Given the complexity of the issues before the jury, the potential prejudice that would stem from its consideration of the testimony for its truth, even with the appropriate limiting instruction, outweighs its limited evidentiary value.

The Government suggests that evidence of the Lay Professionals offering contrary advice to Butselaar establishes evidence that he, ████, and ████ engaged in a conspiracy, as defined by mutual trust and extensive cooperation. Mutual trust and extensive cooperation are also critical to

harmonious professional relationships that do not involve fraud. The existence of any demonstrable criminal conspiracy hinges on an illicit purpose. Mutual trust and extensive cooperation are of course commonplace in lawful, harmonious professional relationships so introduction of this evidence to demonstrate such relationships proves nothing of substance and will only confuse the jury. Absent expert testimony, such purpose is not established, rendering such testimony highly prejudicial.

The Government further seeks to introduce testimony and documents from other purported tax professionals as evidence of Butselaar's knowledge of the "issues" with his advice. Notably, such a purpose does not permit the substance of any of the testimony and documents – in other words, the actual guidance – to be put before the jury.  Regardless, none of the cases cited by the Government support admission on this basis. In each, the defendants were apprised of the illegality of their actions either by their own counsel or by a court's restraining order. *See United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) ("[C]onversations with counsel regarding the legality of [defendant's] schemes would have been directly relevant in determining the extent of his knowledge and, as a result, his intent"); *United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013) (permitting entry of a New York Supreme Court restraining order to demonstrate defendant's knowledge of his obligations).

More importantly, none of the testimony and documents the Government seeks to introduce through these individuals have any dispositive force. In fact, the email from ███████████ outright acknowledges the incipient nature of his views, writing unambiguously that:

> [T]he above [email observations] represents my initial thoughts based upon a brief review of the memos and emails. I would be happy to discuss them further but to provide definitive advice, I would need to spend more time fully understanding the foreign structures, income flows, etc.

Mem. at 14 (██████ email). In doing so, ██████ appropriately signals the unreliability of the opinions offered in the email, a clear indication that it should be precluded from this trial.

The ██████ email, in particular, underscores the inappropriateness of the Government's selective cherry-picking of testimony. ██████ and the other Lay Professionals that the Government intends to put before the jury enjoy no special standing above Butselaar in the merits of their opinions and/or professional judgment. To the contrary, it is more likely that Bustelaar had superior access to information relevant to any meaningful assessment by dint of the duration and depth of his work with the relevant taxpayers. This debate among professionals, including Butselaar, over complicated tax structures and strategies cannot be resolved by a proverbial battle of lay witnesses. Indeed, the one entity that perhaps has the expertise and authority to opine on the key issue of the tax strategy and structure lawfulness would be the IRS – yet it is their 2016 report that the Government now seeks to preclude in favor of less reliable lay testimony. The Government's motion *in limine* on these issues should be denied.

## II.    The Court Should Preclude Evidence Regarding "Control" of the Offshore Structures as Irrelevant

In Points I(B)(3)-(5), the Government seeks to admit certain evidence regarding the operation and management of the DJ Clients' Cyprus and Guernsey-based entities. The Government offers no authority as to if or how these cherry-picked factual data points may be considered by the relevant U.S. tax authorities, let alone how the proffered evidence is relevant to a jury's determination of whether or not Butselaar willfully evaded U.S. tax laws. The Government's motions should therefore be denied.

**A.    Evidence Purporting to Demonstrate That the DJ Clients "Controlled" Their Performances and Business Endeavors Is Irrelevant and Should Not Be Admitted**

In Point I(B)(5) of its motion (Mem. at 24-26), the Government seeks advance permission from the Court to introduce evidence that the DJ Clients "control[led]…their performance schedule and other business endeavors." Mem. at 24. According to the Government, this evidence is relevant for two reasons. First, the Government claims that this evidence is relevant because it "supports a conclusion that the income collected [in the Cyprus entities] was reportable on the DJ Clients' taxes under Subpart F rules." Mem. at 25-26. Second, the Government claims that this evidence demonstrates that the "DJ Clients did not actually function like employees" of the Cyprus entities, which "in turn, makes it more likely that other aspects of the Offshore Structures" were "also being operated differently from what was claimed in the Offshore Structures' documentation." Mem. at 24-26. Neither argument provides a suitable basis for the admission of this evidence.

First, evidence that the DJ Clients were making decisions about the day-to-day operations of the Cyprus entities — such as the "schedule" of performances — is not relevant to proving that the DJ Clients had a tax obligation under Subpart F. As the Government acknowledges in its Superseding Indictment, "Subpart F" is not one rule, but more than a dozen sections. *See* Superseding Indictment at ¶ 4; *see also* Ex. C (IRS Practice Guide, stating that the "provisions of Subpart F are exceedingly intricate and contain numerous general rules, special rules, definitions, exceptions, exclusions and limitations, which require careful consideration."). Even so, nothing in any Subpart F provision states that a person who makes day-to-day decisions about the operations of a foreign company will become liable for the income taxes for that company.

Although the Government cites 26 C.F.R. § 1.957-1(b)(i) in support of its position (Mem. at 26), that provision does not speak to control over the day-to-day operations of a company. Rather, it states that if a "United States shareholder[ ]" has the "power to elect, appoint, or replace" the board of directors (or its equivalent) of the foreign corporation, that U.S. shareholder will be deemed to "own the requisite percentage" of "voting power" necessary to make the foreign corporation a "controlled foreign corporation" ("CFC") attributable to that U.S. shareholder, under Section 957. Thus, it is clear from the rule's text itself that day-to-day business decisions, like "selecting shows" is irrelevant to a Subpart F analysis. *Arlio v. Lively*, 474 F.3d 46, 52 (2d Cir. 2007)(where the admission of evidence would "not tend to prove a material fact, [it is] irrelevant" and should not be admitted). The Court, therefore, should not admit such evidence and testimony, as it will only be confusing to the jury, as well as a waste of the jury's time.

Section 1.957-1(b)(i) *is* applicable, however, in instances in which a U.S. shareholder holds less than 51% of the voting stock of a foreign corporation — which would normally exempt the foreign corporation from being attributed to the U.S. shareholder as a CFC — but has the power to replace the board of directors. Only when a U.S. shareholder with a minority interest holds that power, the foreign corporation can be attributed to him as a CFC. *See Framatome Connectors U.S., Inc. v. Comm'r*, 118 T.C. 32 (2002), aff'd sub nom. *Framatome Connectors USA, Inc. v. Comm'r*, 108 F. App'x 683 (2d Cir. 2004). But the DJ Clients held no stock in the Cyprus entities and thus, again, Section 1.957-1(b)(i). The Government cannot simply "impute" controlling shareholder status to a U.S. tax resident who does not own a single share of the foreign corporation, even if it could prove that person believes that they probably "could" have replaced the directors of the company. This is especially pronounced here, where there is no evidence that the taxpayers ever tried to do so. *See* Mem. at 25 (seeking permission to elicit testimony that the DJ Clients

"understood" that they "could" replace the person nominally running the Cyprus Corporations). Nothing in the text of Section 1.957-1(b)(i) supports the Government's contention that this provision applied to any of the taxpayers in this, none of whom held no stock in the foreign corporation, and the Government cites no authority that would support such a reading of this rule.[4] There is simply no connection under the Tax Code between operational decision-making and tax liability, and for that reason, evidence of operational decision-making is irrelevant and should be precluded.

The proffered evidence is even further removed from any relevance considering there is no evidence that Butselaar was aware of Section 1.957-1(b)(1), let alone held the Government's unsupported interpretation. The Government's claims that it will be able to show that Butselaar was told about "Subpart F" alone are unproven and highlights the premature nature of their request. Mem. at 26, n. 14. The Government needs to demonstrate that Butselaar was aware of Section 1.957-1, shared the Government's interpretation of it *and* understood that this provision meant that the DJ Clients would become liable for the taxes on the income of the Cyprus entities if they made business decisions, like selecting "which shows to play." *See* Mem. at 25; *Cheek v. United States*, 498 U.S. 192, 202 (1991) (in order to prove willfulness in a criminal tax prosecution, the government "must negat[e] a defendant's claim of ignorance of the law or a claim that because of a misunderstanding of the law, he had a good-faith belief that he was not violating any of the provisions of the tax laws."). Even if the Government's interpretation of this provision was correct—which it is not—evidence of operational decision-making by the DJ Clients would only be relevant if the Government could show that Butselaar held the same erroneous understanding

---

[4] A search across the entire Westlaw database returned only 13 cases citing Section § 1.957-1. *See* Ex. E. None of these cases involved the application of this provision to a U.S. person who did not own stock in the foreign corporation.

that the Government does. Because the Government has not and cannot make such a showing, any evidence and testimony that the DJ Clients made choices over things like "performance schedules" is irrelevant and would almost certainly lead to confusion on the jury's part as to the import (which is none) of such evidence.

The Government's second argument contends that the DJ Clients' ability to make day-to-day operational decisions (such as "which shows to play") demonstrates that the "DJ Clients did not actually function like employees" of the Cyprus entities, which "in turn, makes it more likely that other aspects of the Offshore Structures" were "also being operated differently from what was claimed in the Offshore Structures' documentation." *Id.* at 26. This argument — essentially that "real" employees do not make decisions, including over their own work schedules or preferred projects — is even more specious. Employees, especially those in senior positions, are routinely responsible for innumerable decisions about the operations of the company they work for, such as which vendors the company should contract with, how it should market itself, whether to launch a new product, the list goes on and on. The fact that the DJ Clients made decisions about which venues they wanted to play at, and when, is no different than the myriad decisions made every day by a wide range of professionals and does not determine for taxation purposes whether they qualified as "employees" or something else.

The Government suggests that this structure for the DJ Clients was unique to them and therefore nefarious. Loan-out companies — which the Cyprus entities effectively were — have long been recognized as proper organizational structures with the artist participating as a bona fide "employee" of that loan-out, memorialized by an employment contract that states that the artist works at the direction of the corporation. This is true *regardless* of whether the company "actually

14

direct[s] or control[s] the manner in which the services [of the artist] are performed." *See Sargent v. Comm'r*, 929 F.2d 1252, 1256 (8th Cir. 1991).

There is simply nothing unusual, let alone problematic, about the fact that the DJ Clients, as employees of the Cyprus entities, made day-to-day decisions about those companies' operations, rather than being explicitly directed to act by a board of directors. Given this fact, the inference that the Government intends to ask the jury to draw — that because the DJ Clients made certain decisions about the operations of the Cyprus entities, the jury can properly infer that the Guernsey Trusts must also have been "operating differently from what was claimed in the [Trusts] documentation" — lacks a reasonable basis. *See*, *e.g., United States v. Pinckney*, 85 F.3d 4, 7-9 (2d Cir. 1996) (reversing defendant's conviction where the government argued for an "inference" that was based on a "leap of faith, not logic, and [which] had no evidentiary basis."); *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019)(an inference is only permissible when it constitutes "a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist"). The Court should deny this portion of the Government's motion *in limine*.

### B.   The Court Should Preclude Evidence of the DJ Clients' Use of the Offshore Structures to Make Personal Investments

In Point I(B)(3)of its motion (Mem. at 20-22), the Government argues that evidence that "the DJ Clients, counseled by Butselaar and his co-conspirators, used the Offshore Structures to make personal investments or other similar transactions" is relevant to show that "others purportedly own[ed] the Offshore Structures." Specifically, the Government seeks to introduce evidence that, after ▆▆▆▆ and ▆▆▆▆▆▆ were respectively removed as Trust beneficiaries, (1) the [Cyprus company] paid the salary of ▆▆▆▆'s business manager, Alexander von Spaendonck; (2) ▆▆▆▆ expressed interest in investing in a U.S. hotel group and, in order to "skirt" a contractual restriction in another endorsement deal that would prevent the investment, Butselaar

15

proposed making the investment with the Guernsey entities; and that (3) █████ "indirectly"

invested in a Dutch artist management company through the Cyprus entity. Mem. at 20-21.[5]

The Government claims that this evidence is relevant because the foregoing events "would

make little sense" unless █████ and █████ remained the "true owners and intended

beneficiaries" of the Trusts. *Id*. at 21. In other words, absent a direct expression by █████ and

█████ that they were interested in these opportunities as long-term investments to, for

example, fund their grandchildren's college tuition, the DJ clients remained the intended

beneficiaries. The Government then argues that this singular conclusion is further supported by

the fact that neither the DJ Clients nor their advisors had concerns about using the Offshore

Structures to "fund and hold the DJ Clients' personal investments" — an inference that is not

supported by logic or the evidence itself. *See Pinckney*, 85 F.3d at 7-9 (2d Cir. 1996), *Pauling*, 924

F.3d at 656 (2d Cir. 2019).

But the Government has not cited a single statute, case, or even treatise that supports its

argument that these transactions are evidence of the DJ Clients' "true ownership" of the Cyprus or

Guernsey entities. The fact that von Spaendonck, █████'s business manager, was paid out of the

corporate entities managing █████'s music career (which also paid for associated expenses and

---

[5] The Government's assertion that the DJ Clients were removed as trust beneficiaries "as part of a strategy to conceal the connection and control the DJs had to these trusts" is not supported by the evidence it cites, neither of which makes any such reference. In the first (Ex. 2), Butselaar discusses the removal as a Trust beneficiary while a U.S. tax resident without any suggestion that it relates to the operational or managerial control. In the second (Ex. 4), Butselaar notes the fact that, for U.S. tax residents, " the [IRS] not only look[s] at the income █████ receives in the form of a salary or dividend, but also at the companies controlled by him *and* which only receive passive income." The Government infers that Butselaar is indicating that the Guernsey entity fits both definitions, rather than just explaining that the IRS looks at two distinctive aspects that could apply individually to an entity and subject it to taxation. Both █████ and █████ owned and controlled their Dutch BVs, which were reported on their individual U.S. tax returns. The royalties (the passive income to which Butselaar refers) flowed to the Cyprus and Guernsey entities held by the Trusts, which Butselaar believed were unreportable because they were non-grantor trusts.

████'s salary pursuant to an employee agreement), is standard protocol in the music industry and does not suggest that ████ was the true beneficiary of the Trust by any measure.[6] Nor does the fact that certain investments through foreign entities transpired after the DJ Clients "expressed interest" in them — not commanded, directed, insisted or indicated in any other manner suggestive of authority and control — provide evidence, in and of itself, that the DJ Clients were the "true owners" of the Trust, particularly in light of the fact that the Trusts were managed (as the Government concedes) by an independent trustee and board of directors according to the duties and responsibilities outlined in the Trust deeds.

The Government argues that this evidence is also relevant to "highlight[ ] Butselaar's intentional use of the Offshore Structures to obfuscate the involvement of the DJ Clients." Mem. at 22. But that is a gross mischaracterization of the evidence which, on its face, does not support the Government's argument. For example, in the email discussion concerning ████'s interest in investing in a hotel group, a collective decision, not Butselaar's alone, was made to invest the Trust for the express purpose of mitigating the risk that ████ would otherwise be in breach of another endorsement contract. *See* Govt. Ex. 19. It is perhaps evidence of managing numerous corporate relationships and commitments, but it is certainly not evidence that Butselaar was trying to "disguise [████'s] control over certain money and property." Mem. at 22.[7]

---

[6] Although von Spaendonck had a fixed salary, it was paid by the various entities that derived income from ████'s performances, endorsement deals and the like, relative to the percentage of total income each entity was responsible for in any given year.

[7] If anything, the evidence offers greater support for the conclusion that ████ didn't expect to benefit from the investment. In discussing how to avoid the conflict, ████ relays the following: "The way our tax people suggest to get around this is for ██ to create a trust. He would be the Grantor but NOT the beneficiary (his sister could be the beneficiary, for example. Or perhaps Safe From Harm could be the beneficiary). I could be the Trustee (followed by ██) who would be responsible for paying any proceeds to the beneficiary. If ██ were to get married, his spouse (or any children) could become beneficiaries." Govt. Ex. 19.

The Government's argument is further undercut by a subsequent email thread, on which Butselaar is notably not copied, that reveals that his idea to use the foreign Trust was echoed by several others, most notably the attorneys at Kramer Levin — ████ and ████ — who subsequently "detected" in 2018 that ████'s Trust may be a foreign grantor trust by virtue of a provision in the Trust deed. In a series of exchanges between ████ and ████, ████ suggests setting up an LLC that would be owned by the foreign trust, at one point even noting that the "law is a little confused" with certain tax implications and that "many tax advisers" are of a different view regarding taxability than the IRS. Ex. D.

The evidence that the Government proffers with respect to ████'s "interest" in an investment is even less relevant. In addition to the fact that the inference the Government draws about its significance is unsupported for the same reasons as the evidence related to ████, it relates to events in May 2014, when ████ was no longer a U.S. tax resident. Whether or not the Government's proffered evidence supports the inferences it draws is academic, however, in the absence of a connection to an element of the offenses with which Butselaar is charged. The Government's proffered evidence, then, is representative of nothing more than the DJ Clients' advisors, including Butselaar, fulfilling their respective obligations as they relate to the management of their clients' business affairs in a manner that mitigates their tax burden.

    **C.**    **The Court Should Preclude Evidence that the Trustee Witness (████) and Cypriot Witness (████) Were Managing the Offshore Structures to Benefit the DJ Clients**

In Point I(B)(4) of its motion (Mem. at 22-24), the Government seeks to introduce evidence of the DJ's "true ownership" and "control" of the Cyprus and Guernsey entities through ████ ████, who oversaw the DJ Clients' Cyprus entities, and ████, the independent trustee of the foreign Trusts, were "managing assets in the Offshore Structures for the benefit of

the DJ Client." Mem. at 22. The Government argues that these witnesses will show that "the purported removal of the DJ Clients as beneficiaries from the trusts had no substantive impact on how those trusts actually operated." Mem. at 22. The Government does not cite a shred of caselaw supporting its claim that such evidence supports its proffered purpose, and neither does it relate how the evidence is relevant to Butselaar's conduct. The Court should deny the Government's motion as irrelevant under FRE 401.

Though the Government again appears to be seeking the Court's blanket approval for any evidence it believes falls into this bucket, it cites "for instance" that, "before making certain investments using the [Trust's] money, [████] and [████████] sought [███████'s] consent, even after [he] was purportedly removed as a beneficiary of the trust." *Id.* Even though implicit in this and its other examples is the fact that [████] and [████████] were at the helm of the Cyprus and Guernsey entities and managing their day-to-day operations, the Government argues, citing no authority or controlling analysis, that a jury should conclude from these select few instances that the DJ Clients were, "at all relevant times," in de facto control over the foreign entities.

The Government then takes a second leap and asserts that such evidence "supports a finding that the income collected in the Offshore Structures continued to inure to the benefit of the DJ Clients and *had* to be reported to the IRS." Mem. at 23. (emphasis supplied). Recognizing its overstatement given the universally-recognized complexity of the tax code, the Government quickly hedges, adding that, under IRC Section 677, trust assets "'accumulated for future distribution to the grantor' [are] *generally* taxable to the grantor." *Id.* (emphasis supplied). This of course begs the critical question of the factually intense analysis of the tax advice and structures in question that the Government has fatally neglected in pursuing these charges against Butselaar.

Nonetheless, the Government claims that this should be admitted as "direct evidence" of the crimes with which Butselaar is charged (*id.* at n. 11) but does not establish how or why Butselaar's presumptive knowledge that ███████ or ██████ sought the DJ Client's approval of certain transactions, even all transactions, is evidence that he definitively knew the Trusts were grantor trusts whose income had to be reported. The Government's motion to admit evidence without doing the necessary work to establish the evidence's relevance to the charges against Butselaar should be denied.

## III. The Court Should Deny the Government's Motion to Introduce Evidence Demonstrating ████ and ████'s "Motive" to Join the Alleged Conspiracy

In Point I(B)(7) of its Motion (Mem. at 27-28), the Government seeks advance permission from the Court to introduce evidence that "during the relevant period," the "EDM industry and the fashion industry were viewed as growth opportunities" for Gelfand, Rennert, and Feldman ("GRF"), the U.S. business management firm that represented the DJ Clients and employed ████ and ████. Although the Government has referred to ████ and ████ as unindicted co-conspirators in the charging instruments in this case, it has not yet proven the existence of a conspiracy let alone the knowing participation of either ████ or ████ in any such conspiracy.

Even though neither ████ nor ████ have been charged in this case, the Government seeks to introduce into evidence (i) a "draft" PowerPoint deck, prepared for GRF in 2015 (Mem. at Ex. 27) and (ii) ███████████████████████████████████████████████████████ ████████████████████████████████████████████████████. According to the Government, this evidence is relevant because it will provide to the jury evidence of "motive" on the part of ████ and ████ to conspire with Butselaar in the alleged defrauding of the United States through the provision of intentionally incorrect tax guidance.

20

The Court should not admit this evidence. "Motive" is not an element of the charged crimes and the mindset of ██ and ██ is of limited if any relevance to these proceedings against Butselaar. Allowing this evidence to be presented to the jury will also necessitate substantial rebuttal evidence to be presented by Butselaar that will distract the jury and impair Butselaar's ability to focus on his defense, in a manner wholly disproportionate to the evidentiary value of the proffered evidence.

By example, the proffered draft "deck" was created in mid-2015 — *years after* the Government alleges that the conspiracy began. As such, the deck is of little value in explaining what was on the minds of ██ and ██ years earlier, when they purportedly joined in Butselaar's client representations. If anything, the introduction of this draft deck would only encourage the jury to engage in improper speculation. *United States v. Peterson*, 808 F.2d 969, 976 (2d Cir. 1987) (reversing conviction and remanding for new trial where evidence was improperly admitted as a "basis for inferring" defendant's knowledge of a fact where "jury would be forced to speculate"); *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995) ("it is not enough" that an inference urged by the Government is "permissible" and within the realm of possibility. Instead, the Court "must also be satisfied that the inferences [urged by the Government] are sufficiently supported" by the evidentiary record).

Moreover, the Government glides over the reality that neither ██ nor ██ created the draft "deck." Instead, it was created by investment bankers who were representing GRF in a potential sale. *See* Mem. at Ex. 27 (transmittal email from Samir Shah, at Intrepid Investment Bankers, explaining that Intrepid had drafted the deck). In a draft deck that is 41 pages long and contains hundreds of statements, the Government has cherry picked a few that it wants to bring to

the jury's attention. However, the Government has offered no indication as to whether or not ███

or ███ adopted any of the statements or views expressed in the "deck' or even agreed with them.

Moreover, if this evidence is admitted, Butselaar will need to spend substantial time

rebutting the inferences that the Government apparently plans to ask the jury to draw from this

evidence. For example, Butselaar will need to cross examine ██████ on whether ██████ was

████████████████████████████, as stated in the draft deck, or whether that was

just puffery by GRF's investment bankers, relative to the ███ client base which includes far more

significant clients, including Billy Joel, James Taylor, Bob Dylan, Adele, Lady Gaga, Carrie

Underwood and many other "household names."

If the Court admits the draft deck and the testimony of ██████, Butselaar will need to

spend substantial time presenting this rebuttal evidence, so that the jury understands that, in fact,

the DJ Clients were not meaningful contributors to GRF's profits.[8] The jury in this case will

already have a significant challenge in front of it, given the complexity of the tax laws and the

foreign structures that are at issue. A protracted dispute over the finances of GRF and the "motive"

of ███ and ███ is nothing more than a waste of the jury's time. *See, e.g., United States v. Ulbricht*,

79 F. Supp. 3d 466, 492-93 (S.D.N.Y. 2015) (precluding evidence where allowing it would lead

to a mini-trial on collateral issues); *United States v. Graziano*, 558 F. Supp. 2d 304, 324 (E.D.N.Y.

2008) (precluding evidence where it "would lead to a 'mini-trial'"); *United States v. Stewart*, 433

F.3d 273, 313 (2d Cir. 2006) (upholding preclusion of cross-examination necessitating "mini-

trial"). The Court should deny this portion of the Government's motion *in limine*.

---

[8] Throughout the time of the charged conduct, the fees paid by ██████ constituted, at most, one half of one percent of the Firm's annual revenue. In 2014, the one year in which ███ and ███ are alleged to have conspired with Butsleaar to file a false tax return on behalf of ██████████, GRF was paid less than $27,000 in fees by ██████████, an amount which constituted only 0.06% of the nearly $42 million that GRF earned that year.

**IV.    Butselaar Does Not Object to the Introduction of Reputation Evidence for the Specific Purposes Cited by The Government; Similarly He Should Be Permitted to Introduce Evidence of His Personal Circumstances**

In Point I(B)(6), the Government seeks to introduce evidence of Butselaar's reputation as "one of the top advisors in the EDM industry" and that "professionals (such as tax advisors and business managers) were primarily sought through word-of-mouth referrals." Mem. at 26. The Government seeks to introduce this evidence because "[s]uch background is not only probative of the motives of Butselaar … but [w]ithout this testimony, the jury would lack critical facts as to why these clients would entrust these Butselaar with such consequential decisions touching on large portions of their earnings." Mem. at 27. Although reputation evidence purporting to show why the DJ Clients hired Butselaar is irrelevant to the allegations, Butselaar does not object to the introduction for the express purposes set forth in the Government's motion. However, the admissibility of any reputation evidence beyond this scope should be evaluated and determined by the Court in the context of trial.

Finally, the defense does not intend to elicit testimony of evidence relating to Butselaar's extradition, potential punishment, selective prosecution, and impact of the prosecution on his business, it should not be precluded from eliciting testimony from Butselaar about his personal circumstances in the event that he testifies. *See* Mem. at III(B)(6).

## CONCLUSION

For the foregoing reasons, we respectfully submit that the Court should deny the Government's motions *in limine* which seek to preclude Butselaar from introducing evidence relevant to his defense and reserve decision on those that are more appropriately determined in the context of trial.

Dated:  White Plains, New York           Respectfully submitted,
        September 30, 2024

_____
Kerry A. Lawrence
LAW OFFICE OF KERRY LAWRENCE PLLC
140 Grand Street, Suite 705
White Plains, New York 10601
Phone: (914) 946-5900
Email: kerry@kerrylawrencelaw.com

Diane M. Fischer
LAW OFFICE OF DIANE FISCHER
195 Plymouth Street
Brooklyn, New York 11201
Phone: (646) 872-3505
Email: diane@dianefischerlaw.com

Samidh Guha
GUHA PLLC
1740 Broadway, 15th Floor
New York, New York 10019
Phone: (212) 399-8350
Email: sguha@guhapllc.com

*Attorneys for Defendant Frank Butselaar*