UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>FRANK BUTSELAAR,<br>      *Defendant.* | Case No. 22 Cr. 560 (CS) |

# DEFENDANT FRANK BUTSELAAR'S SENTENCING MEMORANDUM

Kerry A. Lawrence
LAW OFFICE OF KERRY LAWRENCE PLLC
140 Grand Street, Suite 705
White Plaines, New York 10601

Diane M. Fischer
LAW OFFICE OF DIANE FISCHER
195 Plymouth Street
Brooklyn, New York 11201

Samidh Guha
GUHA PLLC
860 Broadway, 6th Floor
New York, New York 10003

*Attorneys for Defendant Frank Butselaar*

**LAW OFFICE OF KERRY LAWRENCE, PLLC**
140 GRAND STREET
SUITE 705
WHITE PLAINS, NEW YORK 10601
Telephone: (914) 946-5900
Email: kerry@kerrylawrencelaw.com

Admitted in NY & CT

January 30, 2025

BY ECF
Hon. Cathy Seibel
United States District Judge
United States Courthouse
Southern District of New York
300 Quarropas Street
White Plains, NY 10601

   Re: United States v. Frank Butselaar,
      22 Cr. 560 (CS)

Dear Judge Seibel:

  We submit this letter on behalf of Frank Butselaar, who is scheduled to be sentenced before Your Honor on February 13, 2025. On November 14, 2024, Mr. Butselaar entered a mid-trial plea, pursuant to a plea agreement, to a single count of aiding and assisting in the preparation of a false and fraudulent U.S. tax return, in violation of 26 U.S.C. § 7206(2), in connection with the 2013 Individual U.S. tax return on behalf of Nick van de Wall (Count Two of the Superseding Indictment). He is scheduled to be sentenced by Your Honor on February 13, 2025.

**I.**

**A Sentence of Time Served is Appropriate in This Case**

  We respectfully submit that a sentence of time served is sufficient but not greater than necessary in this case. Mr. Butselaar, who has been incarcerated for approximately 20 months between two foreign countries, has been punished enough. A term of incarceration, which at most would result in a few months of additional incarceration, will not further serve the goals of sentencing. *See* 18 U.S.C. 3553(a)(2). At this moment, Mr. Butselaar is someone who has truly lost everything. His family's savings were depleted while defending his case in Italy. His wife, Annemarieke Pesch, was forced to sell their primary residence in Amsterdam because they could not pay the mortgage, and the bank threatened to seize it. Their home in Italy has been on the market for months, and the sale proceeds are earmarked to repay a substantial loan from a friend that was used towards Mr. Butselaar's defense in Italy after their funds were exhausted. Ms. Pesch,

Honorable Cathy Seibel, U.S.D.J.
Re: *United States v. Frank Butselaar*, 22 Cr. 560
January 30, 2025
Page 2

who is an attorney, lost her job without explanation following Mr. Butselaar's arrest and has been living "rent-free" in a friend's house near the home she was forced to sell.

Mr. Butselaar's separation from his closely knit family has had heart-wrenching consequences for all of them. Since his arrest in Italy, he has not only been separated from his wife, their four grown children (Philip, Alessandra, Lara, and Timothy), his 90-year-old mother, his sister Margit, and his brothers-in-law — but he has not seen them or even been able to communicate with them regularly.[1] During the past year and a half, all of Mr. Butselaar's and Ms. Pesch's children have been suffering from depression and required therapy. Bob de Bruin, Alessandra Butselaar's partner, writes that it has been "heartbreaking [...] to see first hand[] what it did to [her] and the rest of his family [...] [T]hey were a loving and normal family who just wanted to be together to experience life [...]." Ex. A-1.[2] All incarcerated defendants suffer from being separated from their loved ones, but for Mr. Butselaar, it was exacerbated by his family's residency halfway across the world, their inability to visit, and the limited access to phone calls.

Mr. Butselaar also had to endure the pain of his mother-in-law's passing mere weeks before trial. They shared a close bond, and he had not seen her since March 2023. His own grief was compounded by his inability to comfort his bereft wife. Ms. Pesch's brother, Jeroen, writes, "It is heartbreaking that my mother died during his 'absence' without them having been able to speak to each other. Still, however, Frank made the effort to write to her during her last weeks [...] always focusing on positive elements so that her worries would be less." Ex. A-2. Mr. Butselaar's own mother is currently 90 years old and suffers from high blood pressure. Her "biggest fear," Mr. Butselaar's sister Margit writes, "is that she will never see him again." Ex. A-3. Cees Slings, a former client and friend of 40 years, is sure that Mr. Butselaar "has enough friends who want to take over his place in prison for him [...] even if it is only to give [him] the opportunity to be able to put his loved ones, his family and his children in his arms again." Ex. A-4. Ms. Slings offered "to be the first to register for such a replacement." *Id.*

[REDACTED] His

---

[1] Mr. Butselaar has not seen his wife or children since late summer of 2023. He was unable to even speak to them for nearly three months after being extradited to the U.S. because he could not call out to a Dutch phone number and Ms. Pesch could not get access to the videoconferencing platform without first having to validate her Dutch passport with the embassy in Washington, D.C. In addition, Ms. Pesch was afraid to travel to the U.S. after the Dutch Ministry of Foreign Affairs cautioned her that she could be arrested to put pressure on Mr. Butselaar.

[2] Letters that have been excerpted are attached as Exhibit A and individually numbered (e.g. A-#). Letters that have not been excerpted are collectively attached as Exhibit B.

[3] As of the date of this submission, Mr. Butselaar does not have the final Presentence Report ("PSR"). References to the PSR are to the draft report dated January 8, 2025.

friend, Job Smeltink noted the decline in the several letters they exchanged during his incarceration. Mr. Smeltink writes,

> [W]e talked about the books we both like, about our shared passion cooking, and about []his well-being. These letters show how much life in prison has affected him both mentally and physically. In my belie[f], he is going through extremely hard times and suffers to a great extent. To me this situation in prison is very extreme and does no just[ice] to the kind man he is.

Ex. A-5.

In July 2024, the Chaplain, Father Ihor Vorontsov, submitted a letter to the Court of his own accord to "offer some insights" from his personal experiences with Mr. Butselaar. Ex. A-6. He wrote that he has "come to know Frank as a person who is earnest and reflecting on his circumstances" and that "[d]espite the challenges of his situation, he has shown a consistent willingness to engage in programs that foster personal growth and rehabilitation." *Id.* Father Vorontsov noted that Mr. Butselaar's "participation in various group activities, especially those geared towards spiritual and emotional healing, has been commendable" and that "further incarceration may not serve his rehabilitation [as] effectively[] [as a] supportive and structured environment [...]." *Id.*

Mr. Butselaar's reputation has suffered irreparable damage. In its pleadings, motions, presentation at trial, and even to Probation, the government unrelentingly portrayed Mr. Butselaar as an unscrupulous schemer who saved his clients tens of millions in taxes that were in reality owed to the U.S. government solely to burnish his reputation as the "go-to guy" in the EDM industry. The inability to effectively combat this depiction, which could not be farther from the truth and is now memorialized in publicly available court filings, was one of the most agonizing aspects of engaging in Mr. Butselaar's defense. His former colleague, Ramona Vervuurt, recounts how, in the Netherlands, Mr. Butselaar's "case has been a nationwide media topic[,]" and observes that the "reputation which he built diligently for all those years is broken." Ex. A-7.

When he ultimately returns to the Netherlands, it will be to a daunting and uncertain future. In Mr. Pesch's estimation, "In the Netherlands, Frank's life is over[.] [There is] nothing left of his career, no home, no car, no money, no pride. I think [he] has suffered enough." Ex. A-2. His daughter, Lara Nettehoven, laments, "We are all he has left. And even though that is the most important thing in life, having your loved ones [...] he has got a long way to go before becoming happy again." Ex. A-8. Although Ms. Pesch has and continues to support Mr. Butselaar, the repercussions she has suffered have taken a toll on their relationship. In addition to losing her home and her job, she was doggedly pursued by the Dutch media for comment on the case. She endeavored to defend her husband's reputation and honor in response to their inquiries, only to

Honorable Cathy Seibel, U.S.D.J.
Re: *United States v. Frank Butselaar*, 22 Cr. 560
January 30, 2025
Page 4

learn that it ruffled the feathers of the U.S. prosecutors who suggested Mr. Butselaar had disclosed protected information, which had never been the case.

In addition to alleviating the distinct hardships that Mr. Butselaar has suffered and will continue to suffer under continued confinement, a sentence of time served would account for credit and conditions that Mr. Butselaar is not eligible for as a non-citizen. For example, if sentenced to the statutory maximum of 36 months as a U.S. citizen, Mr. Butselaar would be eligible for transfer to a halfway house at the time of this sentencing. As a non-citizen, however, he is ineligible for a halfway house or home-confinement (typically available for up to 10% of the sentence) and will likely remain in custody for the entire duration of his sentence. Mr. Butselaar is also not eligible for a facility with the lowest security designation (i.e., a federal prison camp) or other early-release programs, all of which would be afforded to any similarly situated defendant who is a U.S. citizen. Although, like all criminal defendants, Mr. Butselaar will be credited for good conduct time, whether he can accrue First Step Act credits as a non-citizen is unclear. Even if he is able to do so, he must first arrive at the facility designated by the BOP, complete the "needs assessment" survey, get a job, and put his name on the programs' wait lists. In short, the avenues by which a defendant typically receives credit against his term of imprisonment, in Mr. Butselaar's case, will likely be delayed by the processes and logistics within the BOP.

There is also the likelihood that Mr. Butselaar will be transferred from the Westchester County Jail to the Metropolitan Detention Center pending designation if sentenced to any term beyond of incarceration. The unabated horrors of the MDC, well-documented in court rulings, filings, and the media, have even resulted in courts turning to alternatives rather than sending the defendant to endure the conditions there. *See, e.g., United States v. Chavez*, 22-CR-303 (JMF), 2024 WL 50233, *9 (S.D.N.Y. Jan. 4, 2024) (allowing defendant subject to mandatory detention to remain out on bail pending sentence due to the "grim conditions" at the MDC), *United States v. Colucci*, 23-CR-417 (GRB), 2024 WL 3643857, *7 (E.D.N.Y. Aug. 5, 2024) (imposing home confinement even though statutory factors indicated that a sentence of incarceration was warranted due to risk that the defendant would be sent to the MDC).

Mr. Butselaar has already suffered disproportionate punishment relative to others involved in the government's alleged conduct and to similarly situated defendants in other prosecutions. After more than a year of litigating this matter, including a substantial presentation of evidence and argument by the government, one fact is irrefutable. Many people were in Mr. Verwest's and Mr. van de Wall's advisory orbit, and none have had to face allegations of criminal misconduct. Alleged co-conspirators who, by the terms of their engagement letters with the clients, were responsible for ensuring proper U.S. tax filings not only avoided criminal charges but have continued to process tax returns for clients to this very day. Mr. Verwest and Mr. van de Wall continue to have immensely profitable professional careers. To paraphrase Omar Little in *The Wire* (and "The Farmer in the Dell"), Mr. Butselaar is "the cheese stand[ing] alone" in terms of

punishment. It is impossible to ignore the reality that Mr. Butselaar alone has suffered sanctions due to the government's prosecution of this matter.[4]

## II.

## Mr. Butselaar's History and Characteristics

### A. Personal Background and Professional Life

Well before his first encounter with a deejay, Mr. Butselaar had already established a word-of-mouth reputation as a "go-to" advisor for artistic professionals, though for reasons antithetical to the government's characterization at trial. Mr. Butselaar was well-known for his impeccable and tireless work, exceptional knowledge of media and entertainment, and dedication to his clients, who were primarily musicians, fashion models, and designers — industries associated with exploiting their "talent." He was also known for his warm manner and "father-like" nature or, as one former client describes him, "the uncle everyone would like to have." As the thirty-seven letters of support attest, Mr. Butselaar deeply invests his time and energy into his interpersonal relationships, whether with clients, colleagues, family, or friends. Many letters are from friends he has had since university, who are part of a group he continued to see weekly for a few rounds of squash and dinner. As a culinary enthusiast, he prefers to socialize over a meal, usually one he has carefully planned and prepared, and he is uniformly described as a "family man" in the truest sense. When he's not spending time with family, he is likely talking about them to one of his many close friends from university, with whom he gathered weekly.

Mr. Butselaar, now 65, was born in Haarlem, a city near the sea in North Holland, approximately 12 miles west of Amsterdam, to Hans Butselaar and Margareth (neé Kelder). He has one sibling, his sister Margit, approximately five years his junior. Hans had a career in the book printing business, and Margareth worked for an agency that found retail buyers for high-end 'pret a porter' fashion brands. Hans and Margareth had a good relationship with each other and their children. Mr. Butselaar was an independent and self-possessed child. After taking the placement exam in primary school, he attended a "first-tier" school in the Netherland's five-tier high school system. He developed a passion for field hockey and had natural skills further enhanced by his fervor for the sport. In addition to playing for his school, he joined a club team and was invited to compete internationally for one year. He trained three evenings each week plus weekends, coached youth teams, and held aspirations of playing professionally.

At 18, Mr. Butselaar enrolled at the University of Leiden and continued to compete in field hockey. The University was divided into six-year programs for law, math and science, economics, and history, and he graduated with a degree in tax law. The University of Leiden had several social groups, including "annual clubs" of 15 students in the same year of school and larger mixed-year

---

[4] This is not an argument that Mr. Butselaar pressed before or during trial. Quite to the contrary, Mr. Butselaar has never voiced the desire to see any other person subject to prosecution. As we noted in our opening argument, Mr. Butselaar did not intend to "point the finger" at anyone else at trial or otherwise.

Honorable Cathy Seibel, U.S.D.J.
Re: *United States v. Frank Butselaar*, 22 Cr. 560
January 30, 2025
Page 6

fraternity houses. Mr. Butselaar still maintains close relationships and frequent contact with his "annual" and "house" brothers.

In 1985, during his final year at university, Mr. Butselaar started working as a trainee tax lawyer for the Amsterdam office of a large accounting firm, Coopers and Lybrand ("C&L"). He was offered a full-time position after he graduated. C&L sponsored Mr. Butselaar's continued professional education to become a "tax lawyer" through the Dutch Tax Bar Association. Mr. Butselaar spent the first two years of the program as a graduate student and an additional three to four years as a teacher. C&L subsequently merged with the "more sophisticated" firm PricewaterhouseCoopers ("PWC"), where Mr. Butselaar started to learn about intellectual property rights while advising a large pharmaceutical company.

After approximately 20 years at C&L/PWC, Mr. Butselaar joined the Amsterdam office of Greenberg Traurig, which had been started by several former PWC tax and legal partners, and started to take on entertainment clients. His first were two Dutch television production companies, one of which, John de Mol Produkties, became very successful in producing reality television series across Europe. John de Mol's sister, Linda, was a well-known television personality and hosted several Dutch shows. Ms. de Mol also became Mr. Butselaar's client, and he represented her for over a decade. During that time, Ms. de Mol became a household name and was offered gigs across European borders. Mr. Butselaar navigated different taxation systems and became well-versed in the complexities and pitfalls of earning international income, particularly the risk of double taxation.

Mr. Butselaar's tax advisory practice evolved to include fashion models and musicians — individuals who, in addition to paying taxes in multiple countries, typically keep only a portion of their contract income after agents and promoters take their percentage cuts. The fashion models, in particular, were young and had little understanding of their finances or how to protect them. His sister, Margit Roem, recollects that they "were usually young girls who lived alone for example in Paris," but who knew that if "they had a hard time, they could call Frank[,] [e]ven during his vacation." Ex. A-3. Ms. Roem remembers that "[a] model herself told me what a huge support Frank [...] had been. He was like a father for her." *Id.* Mr. Butselaar often worked closely with the parents, siblings, and other family members for the models (as the Court may recall from the trial testimony), given their youth and understandable lack of experience in navigating the fashion world. Although these engagements were not typically very profitable by law firm standards, Mr. Butselaar took seriously his responsibility to protect his clients financially and plan for their future, especially given the typically short shelf life of a fashion model's career.

Andre Smits, a private banking colleague who worked with Mr. Butselaar on investment management and financial planning for several clients, writes that Mr. Butselaar's "focus [was] always [...] on helping others navigate the complexities of financial systems responsibly" and that he "always prioritized transparency and ethical conduct." Ex. A-9. Mr. Smits "came to respect him for his integrity and professionalism[,]" adding that Mr. Butselaar's "dedication to providing lawful, sound financial advice was evident in all our interactions, as was his genuine desire to act in the best interests of his clients." *Id.* Anton Eikhout, who also works in private banking and has

known Mr. Butselaar for 15 years, recounts when Mr. Butselaar enlisted him to manage the assets of a former client, who was then elderly and suffering from dementia. Ex. A-10. Mr. Butselaar had been working to dissolve a trust holding the client's assets because the trust office would not release funds to the client's care home. *Id.* Mr. Eikhout recalls Mr. Butselaar telling him that "[i]t was one of [his] first clients many years ago" and that even though he spent a lot of his time on the case without being paid, "he felt responsible for his old clients where nobody seemed to look after him." *Id.*

Ilja Visser, a Dutch haute couture designer, describes herself as "a creative person with no business skills at all" when she was introduced to Mr. Butselaar by a mutual friend. Ex. A-11. Ms. Visser, who writes that Mr. Butselaar advised her on different matters from "the moment [he] was introduced to [her]," writes: "Frank saw me stumbling and took the role of father/advisor. He has helped me for years. I could call him day and night to ask for his advice. He always made time for me; he never told me he was too busy." *Id.* Another fashion designer client, Monique Collignon, recalls that Mr. Butselaar impressed her as a "very honest and down-to-earth […] a very sympathetic gentleman" when she sought his advice in 2008. Ex. A-12. Ms. Collignon writes,

> [h]e wanted to help me and assisted me wherever he could without even sending an invoice. [...] Where else do you find that, that a professional person offers such a helping hand? […] [He] also put me in touch with other people who could be important for my work. This is Frank in a nutshell, always connecting and never expecting anything in return.

*Id.* Ms. Collignon notes that she "could always go to Frank with a question or just to share something with him for advice[,]" and she knew "a number of people in [her] professional environment" shared the same sentiment. *Id.*

Xenia Kasper, Ms. de Mol's talent manager, who has been friends with Mr. Butselaar for over 30 years, describes a similar experience: "Frank has always been there for everyone — both on a business and a personal level — he is one of the few people who does not take advantage of others, providing high-quality advice without [a] hidden agenda […]." Ex. A-13. Ms. Kasper recounts how "Mr. Butselaar worked pro-bono for one of my clients as she launched her own charity, and advised another one of my clients on setting up her charity as well (again, also pro-bono)." *Id.*

Cees Slings is a composer, arranger, and producer for television and radio who became Mr. Butselaar's client 40 years ago when he was still employed at PricewaterhouseCoopers. Ex. A-4. Ms. Slings writes that Mr. Butselaar's "reliability and meticulousness in all respects" was of "[g]reat significance" to her over the years, such as when she was hired to compose and produce music on-site for a long-running German drama series for seven years. *Id.* Mr. Butselaar worked directly with the German tax authorities in advance to "create[] a clear and transparent image for both [Dutch and German] tax authorities." *Id.* Ms. Slings also describes how Mr. Butselaar advised some of her colleagues "for nothing" and offered to assist her neighbor after she learned that her

recently deceased husband had a tax liability, noting that he "never sen[t] any invoices if he could help someone in trouble with his specific knowledge." *Id.*

This was not simply Mr. Butselaar's "client-facing" persona. As a shareholder at Greenberg Traurig, Mr. Butselaar worked closely with his fellow shareholders.[5] He was a dutiful corporate citizen, collaborating with his colleagues and offering his international tax expertise to the firm's many corporate clients. Esther Tissen, Mr. Butselaar's colleague at Greenberg, writes, "Frank has always been one of those colleagues and business partners who has shown respect, politeness, and support. These are qualities that should be normal but unfortunately, are not always found in our profession." Ex. A-14. Ms. Tissen adds that even after she left Greenberg to start her own tax advisory firm in 2009, she maintained a professional relationship with him simply "because of the person he is." *Id.*

Astrid van Wijnbergen started working at Greenberg Traurig after she finished her university studies in 2006, and Mr. Butselaar became her "first employer." Ex. A-15. Ms. van Wijnbergen's best friend had recently passed away, and she recalls that "[b]alancing the challenges of a first job with the grief of such a personal loss was very difficult[.]" *Id.* She writes that Mr. Butselaar's "understanding, patience, kindness and support helped [her] navigate through a working life and deal[] with great loss." *Id.* Ms. van Wijnbergen adds that she has "learned an extraordinary amount" from Mr. Butselaar over the 27 years that they have worked together. *Id.* She believes he "has a big heart" for his clients and characterizes the advice that he gave them as "always generous and thoughtful, not out of self-interest but because he genuinely cared for their well-being." *Id.*

Isabel Wijffels, an intellectual property lawyer and General Counsel of a Dutch biotech company describes herself as "passionate about [her] job and about helping people," which is why she felt a connection to Mr. Butselaar when they worked together at Greenberg. Ex. A-16. She relates that Mr. Butselaar was "a hard-working, kind and modest colleague who felt strong[ly] about the quality of his work and advising his clients in a professional way." *Id.* Ms. Wijffels, who notes that Mr. Butselaar "was regarded as a highly valued colleague" at Greenberg, also credits him with helping her navigate a "challenging relationship" with another partner, which allowed her to "regain [...] confidence to do [her] job the best [she] could and [...] to trust in [her] own judgment [...]." *Id.* Ms. Vervuurt had a similar experience working for Mr. Butselaar 20 years ago and "will never forget the positive impact" he made in her life. Ex. A-7. Ms. Vervuurt writes, "He entrusted me with his work and patiently took the time to teach me the fundamentals about our trade. He took me to meetings with the tax authorities to gain experience and we dove together into tax technical matters [...]. He was [...] not afraid to be critical if my work was not up to par[,] [but] did this in such manner that it was building my knowledge and self-esteem." *Id.*

---

[5] "Shareholder" is Greenberg Traurig's designation for their "partners" or senior tier of attorneys and tax lawyers.

### B. Mr. Butselaar's Deep Connection to His Family

To better understand the profound despair Mr. Butselaar has endured from the complete separation from his family, it is helpful to know how central his family relationships are to him. The prospect of reuniting with his family has been his one constant source of hope.

Mr. Butselaar met Ms. Pesch in 2006, and they married in 2011. Together, they have what Ms. Pesch calls a "happy composed family" because they each have children from prior marriages who "like each other [...] [and] feel like real brothers and sisters[.]" Ex. A-17. Mr. Butselaar and his first wife went through a difficult divorce in 2004 after she started a relationship with another man. Following their separation, their son Philip and daughter Alessandra, who were approximately 10 and 7 at the time, resided primarily with their mother, which Alessandra observed "was very hard" on her father. Ex. A-18. Ms. Butselaar remembers that when they were with him, he "[made] sure [they] would spend every second of that weekend together." *Id.* She recalls that whether it was "[c]ooking together, doing groceries, going to [her] brother's hockey game, [or] watching movies together [...] I enjoyed every second of it," adding that her father "had the ability to even make the smallest activity something fun [,] [w]hich is something I also aspire to do in life." *Id.*

Ms. Pesch, who wryly observes that Mr. Butselaar is "a wonderful person[,] otherwise I wouldn't have married him[,]" writes that she "feels very blessed" for the close bonds that their children share. Ex. A-17. She describes her husband as "a very loving and caring person, for me, for our parents, and for friends and acquaintances." *Id.* Ms. Pesch's daughter, Lara Nettekoven, and son, Timothy Nettekoven, are of similar ages to Mr. Butselaar's children. They did not maintain a close relationship with their biological father following their parents' divorce and describe how they have long considered Mr. Butselaar in that role. Ms. Nettekoven writes:

> Frank came into my life when I was about twelve years old [...] and we became close very fast. Not speaking to my own (biological) father very often, it was nice having Frank around taking on that role, but not in a misplaced way. He showed up for my school plays, he was there at my graduations, he went with me on parent-days from my sorority, he came to pick me up in Amsterdam when I was sick: all things my own father did not do. [...] [he] always wanting to take care of us, even though we were old enough to do certain things ourselves. He insisted on preparing all of our lunches in the morning for example. He was always thinking about how to make us happy. [...] [and] never treated me or my brother as stepchildren.

Ex. A-8.

Ms. Nettekoven's brother Timothy echoes her sentiments, recalling that Mr. Butselaar "gave [him] the attention and guidance [he] needed" and "taught me the life lessons my real father didn't, from understanding relationships, sports, and work to simply enjoying life and having fun."

Ex. A-19. Mr. Nettekoven notes that Mr. Butselaar "always made an effort to create meaningful experiences for others[,]" such as when he prepared a three-course dinner for Mr. Nettekoven and 15 friends to celebrate his 21st birthday. *Id.* He recalls how Mr. Butselaar "took care of every detail to ensure it was a perfect celebration [and] even gave a heartfelt speech that brought me to tears." Mr. Nettekoven writes that he will "always be thankful" for the "immeasurable impact" Mr. Butselaar has had "on shaping the person [he is] today." *Id.* Even Ms. Pesch's brother Jeroen considers himself "extremely lucky" that Mr. Butselaar came into their lives and for his brother-in-law's "never-ending efforts to 'merge' his own two children with the children of my sister and even with my children." Ex. A-2. Mr. Pesche also observed that Mr. Butselaar "really took up the role of son-in-law [,] which was highly appreciated by [his] parents." *Id.*

      Mr. Butselaar's culinary prowess is widely known among his family and friends. His son Philip describes his father's "deep passion for cooking and […] joy in preparing meals for his loved ones." Ex. A-20. Mr. Butselaar's sister Margit comments that "[h]is annual Christmas dinners are our best memories" (Ex. A-3), and her husband, Paul Roem, simply describes them as "legendary." Ex. A-21. Ms. Roem, like many, describes her brother as "a real family man," noting the care he took of their father, who passed away in 2016 after a 7-year-long battle with acute leukemia. Ex. A-3. She writes, "My father often had to go to the hospital suddenly […] [and] could always call Frank for that" even though "[m]y parents and Frank lived an hour away from each other, and the hospital was also half an hour away." *Id.* She adds that Mr. Butselaar "always came right away […] [y]ou can't wish for a better son […]." *Id.*

      Kees Fontein has been Mr. Butselaar's neighbor for nearly twenty years, during which he observed Mr. Butselaar to be a "pleasant, modest and hardworking individual" who "live[d] for breaks with his family [...]." Ex. A-22. He adds that Mr. Butselaar has "nothing ostentatious," and notes that whenever they went to their "modest" holiday home in Italy — one "very much like many Dutch families have […] to escape the often miserable local weather circumstances[,]" — they drove in one of the "slightly used second-hand cars they owned […]." Mr. Fontein's comments on Mr. Butselaar's lifestyle underscore a message expressed by his former colleagues and clients — that he is not motivated by financial gain or the desire to elevate his lifestyle but because he has a passion for his work.

      Mr. Butselaar's friends, family, and former colleagues describe feeling stunned upon learning that he pled guilty in this case and express that it has not altered their opinion of him. Ms. Wijnbergen writes that the "revelation came as a profound shock" because she has "always believed in his good heart, his genuine care for his clients, and his innocence." Ex. A-15. She adds that "even now," she "continue[s] to believe in his integrity and the values he has always stood for." *Id.* Mr. Pesch remarked that "the concept of Frank pleading guilty of a crime is just as unreal as Frank being accused of a crime," adding that it "does not affect [his] personal opinion about [him] at all." Ex. A-2. Ms. Tissen finds this case "difficult to understand and deeply shocking because Frank has always been sincere, careful, and protective of his family, friends, and colleagues." Ex. A-14. Ms. Wijffels also felt "enormous surprise" at the news because she views Mr. Butselaar "as an honest professional" who was "determined to prove his innocence." Ex. A-

16. She believes that his decision to plead guilty was "what he had to do to keep a chance of surviving this horrible situation." *Id.*

Dennis Bouland, a friend since university and part of Mr. Butselaar's weekly squash group, also "didn't expect" this result but notes that it "does not change [his] perception of Frank as a person nor […] [his] friendship with him." Ex. A-23. Another university friend, Jaap Claessens, echoes that sentiment: "[I]t has been a great shock […] I could never imagine this would happen to him […] I have always known Frank as a very honest, reliable person." Ex. A-24. "I [have] know[n] Frank over 35 years," writes his friend Peter Klessens, "and I never could imagine that this gentle, caring person, who helped so many people, is guilty." Ex. A-25.

### III.

### The Plea Agreement and Sentencing Guidelines

**A. Mr. Butselaar's Plea Agreement**

Mr. Butselaar pleaded guilty pursuant to a Plea Agreement dated November 14, 2024 (the "Agreement"), to one count of aiding and assisting in the preparation of a false and fraudulent U.S. tax return in violation of 26 U.S.C. § 7206(2) (Count Two of the Superseding Indictment) relating to the filing of Nick van de Wall's individual U.S. return for the tax year 2013. The offense of conviction has a statutory maximum sentence of 36 months imprisonment. For purposes of the Guidelines calculation, the parties stipulated to a tax loss greater than $550,000, yielding a base offense level of 20. A total of 4 levels were added because the offense involved sophisticated means and because it involved the abuse of a position of trust or special skill under U.S.S.G § 3T1.1(b)(2) and § 3B1.3, respectively. Two levels are removed because Mr. Butselaar qualifies as a zero-point offender under U.S.S.G § 4C1.1. Consequently, the final adjusted offense level is 22, which yields a range of 41-51 months' imprisonment.[6] In accordance with U.S.S.G § 5G1.1(a), Mr. Butselaar's Guidelines range is 36 months, the statutory maximum sentence.

Mr. Butselaar will have served approximately 20 months of incarceration at the time of sentencing. This does not include the period of home incarceration in Italy that sharply restricted his life, although it is not automatically credited.

**B. The Offense Conduct**

Frank Butselaar is prepared to stand before the Court to be sentenced for his guilty plea to Count Two of the superseding indictment. As Your Honor is well aware, the Government offered Mr. Butselaar the opportunity to plead to this limited conduct mid-trial, before resting its case and

---

[6] The Agreement stipulates that, should the Court find that the tax filings related to Tijs Verwest between 2012 and 2017 are relevant conduct, the base offense level is 28 and a total adjusted offense level of 30 is applicable.

Honorable Cathy Seibel, U.S.D.J.
Re: *United States v. Frank Butselaar*, 22 Cr. 560
January 30, 2025
Page 12

before the defense presented evidence. It extended the ultimate offer as the jury arrived at the courthouse to continue the proceedings.

Pursuant to a plea agreement and allocution negotiated while the trial proceeded that morning, Mr. Butselaar acknowledged to the Court under oath that

> On or about January 20, 2015, Frank Butselaar willfully aided and assisted in the filing of a materially false tax return for Nick van de Wall, p/f/a 'Afrojack' for tax year 2013. In doing so, Butselaar agreed with ███████████████████████████████████ ████████ that the return for that year would be filed without including overseas income that they all knew should otherwise have been reported.

See Transcript of Plea, 11/14/24 at 23: 17-24; *see also*, Agreement at fn.1 (memorializing the agreed-upon allocution between the government and Mr. Butselaar). Mr. Butselaar accepts responsibility for this conduct.

There is relevance in the history of this investigation and prosecution. Although the government's discovery production indicated that a third party was the primary target of its investigation — literally the "name on the file" — and the government repeatedly referenced the collaboration of numerous co-conspirators, Mr. Butselaar was the only party charged. Upon Mr. Butselaar's arrest in Italy on or about July 14, 2023, the government issued a press release titled, "International Tax Advisor Arrested For Helping To Conceal Over $100 Million of Income for High-Net-Worth U.S. Advisors," in which it described a sprawling scheme involving co-conspirators over several years.[7] The government pressed for Mr. Butselaar's incarceration abroad and upon his extradition to the United States in the pre-trial phase of its prosecution, and its basis for extradition centered on the extraditable offense of conspiracy. Yet when it fashioned the mid-trial plea offer to exit the prosecution, the government abandoned the top count in the superseding indictment alleging a conspiracy and the three leading counts concerning the tax filings of Tijs Verwest p/k/a "Tiesto" (the "Verwest Allegations").

The government's discretion to offer Mr. Butselaar this plea was not unfettered. The Justice Manual emphasizes that the government should require that a defendant enter a guilty plea to "the most serious readily provable offense consistent with the nature and extent of his/her criminal conduct." U.S. Justice Manual, Section 9-27430 ("Selecting Plea Agreement Charges"). The Justice Manual further authorizes the government in tax prosecutions only to offer pleas to "major counts" without seeking prior approval from the Department of Justice Tax Division. *See* U.S. Justice Manual, Section 6-4.310 ("Major Count Policy in Plea Agreements"). Under the "Major

---

[7] *See* "International Tax Advisor Arrested For Helping To Conceal Over $100 Million Of Income For High-Net-Worth U.S. Taxpayers." *Available at* https://bit.ly/3PScx8a

Honorable Cathy Seibel, U.S.D.J.
Re: *United States v. Frank Butselaar*, 22 Cr. 560
January 30, 2025
Page 13

Count Policy," the government voluntarily walked away from the four most serious counts in its indictment against Mr. Butselaar, instead offering him a plea to its most minor count.

Relieved of its burden of proving the four counts that it surrendered, the government almost immediately pivoted. In connection with Mr. Butselaar's allocution itself, the government offered the Court a lengthy, pre-prepared description of the alleged conduct it might prove at trial — a recitation rich with irony given that it had just abandoned its prerogative to prove the lion's share of its conduct. The government's willingness to forgo the remainder of its prosecution in offering Mr. Butselaar this plea was then contradicted by its subsequent public relations campaign. Several days later, the government issued a press release intentionally exaggerating Mr. Butselaar's plea.[8] Statements attributed to the then-U.S. Attorney in the press release were demonstrably false and in disregard of the Court's admonition that any press release issued be accurate. Mr. Butselaar's counsel expressed concerns about misleading press releases from the government.

The government's attempt to sanction Mr. Butselaar through the backdoor for conduct that it deserted did not stop with its unfortunate press release. Defense counsel was surprised to read the Probation Department's preliminary pre-sentence report, which included a lengthy, adjective-laden description provided to it by the government again of the alleged conduct that it declined to prove at trial. The government offered the Probation Department a carefully and misleadingly curated selection of exhibits and demonstratives, willfully excluding trial evidence and other *Brady* material that undermined its far-reaching allegations. Simply put, the government seeks to press at sentencing the conduct that it charged and had ample opportunity to prove at trial but chose not to pursue. This strategic but unprincipled use of the related conduct sentencing paradigm should be rejected.

For the foregoing reasons, Mr. Butselaar should be sentenced based on the conduct underlying the offense of conviction.

### C. Acceptance of Responsibility

Mr. Butselaar should be granted a two-point reduction to his Sentencing Guidelines offense level based on his acceptance of responsibility. As the Court is well aware, United States Sentencing Guidelines Section 3E1.1 permits Mr. Butselaar's offense level to be decreased by two levels "if the defendant clearly demonstrates acceptance of responsibility for his offense." While the government and counsel for Mr. Butselaar had preliminary plea discussions, Mr. Butselaar arrived at court on November 14, 2024, prepared to continue his defense. The government initiated new plea discussions that morning, and Mr. Butselaar decided to accept their new offer and forgo his defense.

---

[8] *See* "International Tax Advisor Pleads Guilty To Tax Fraud In Concert With U.S.-Based CPAs." *Available at* https://bit.ly/4jE99ew.

Honorable Cathy Seibel, U.S.D.J.
Re: *United States v. Frank Butselaar*, 22 Cr. 560
January 30, 2025
Page 14

None of the conditions that would support opposition by the Government to this adjustment exist. The plea agreement states that:

> "[n]othing in this Agreement limits the right of the Government to seek denial of the adjustment for acceptance of responsibility, *see* U.S.S.G. § 3E1.1, regardless of any stipulation set forth above, *if the defendant fails clearly to demonstrate acceptance of responsibility, to the satisfaction of the Government, through the defendant's allocution and subsequent conduct prior to the imposition of sentence.*"

Plea Agreement at 4 (emphasis supplied).

First, Mr. Butselaar's allocution met the satisfaction of the Government. The Government insisted on the language of Mr. Butselaar's allocution as a condition of their plea offer, and Mr. Butselaar complied. Second, Mr. Butselaar's conduct before the imposition of sentence has been without incident. Mr. Butselaar has been and will continue to be a model inmate in the *interregnum* between his plea and sentencing. Accordingly, Mr. Butselaar should receive an additional two-point reduction to his Sentencing Guidelines range.

### D. Restitution

1. *No restitution is due or owing to the IRS from the count of conviction.*

Mr. Butselaar's plea to Count Two regarding the 2013 van der Wall tax return does not require the payment of any restitution because there are no tax obligations, financial or otherwise, outstanding associated with that filing. Restitution is only authorized where there has been an actual loss to an identified victim. *See United States v. Lacey*, 699 F.3d 710, 721 (2d Cir. 2012) ("restitution is authorized [...] only for the victim's actual loss."). In this instance, the Internal Revenue Service is the sole identifiable victim of the conduct, as confirmed by the PSR, which incorporated the government's position. *See* PSR at ¶50.

Accordingly, the absence of any amount due or owing to the IRS based on the 2013 van de Wall tax filing precludes any restitution order in connection with Mr. Butselaar's guilty plea.

2. *Restitution for alleged relevant conduct is unlawful*

The defense anticipates that the government will allege that Butselaar's sentencing should account for as relevant conduct the allegations concerning the Verwest tax filings that it abandoned mid-trial (the "Verwest Allegations"). Butselaar did not plead to, nor was he convicted separately,

Honorable Cathy Seibel, U.S.D.J.
Re: *United States v. Frank Butselaar*, 22 Cr. 560
January 30, 2025
Page 15

of any misconduct or wrongdoing relating to the Verwest Allegations. Nonetheless, the defense anticipates that the government will seek restitution, which it claims is connected to its Verwest Allegations. However, binding Supreme Court precedent precludes any consideration of the Verwest Allegations to impose restitution at sentencing. Accordingly, any claim by the government for restitution in connection with the Verwest tax filings must be denied as a matter of law.

The Supreme Court has held that restitution is authorized only for "the loss caused by the specific conduct that is the basis of the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 413 (1990); *see also United States. v. Oladijemi*, 463 F.3d 152, 158 (2d Cir. 2006) (applying the Supreme Court determination in *Hughey* "that the courts lacked authority, under the relevant statute, to order a defendant, who was charged with multiple offenses but pleaded guilty only to one, to make restitution for losses arising from related offenses to which he had not pleaded guilty."); *United States v. Angel Pereda,* No. 21-CR-800-LTS, ECF. No. 39, 3 (Oct. 18, 2022) (Chief Judge Swain, J.). The Supreme Court in *Hughey* found the statute's language indicative of Congressional intent that "the loss caused by the conduct underlying the offense of conviction establishes the outer limits of the restitution order." *Hughey*, 495 U.S. at 420. The Second Circuit has applied *Hughey* to determine that "the court may not order restitution for 'loss[es] caused by relevant conduct' under the Guidelines[.]" *United States v. Sullivan*, 118 F.4th 170, 232 (2d Cir. 2024) (quoting *United States v. Vilar*, 729 F.3d 62, 97 (2d Cir. 2013).

While the Court may include relevant conduct to determine the applicable offense level, it is required to "*separately* analyze loss with respect to the restitution order because a court's power to order restitution is limited to actual loss." *United States v. Carboni*, 204 F.3d 39, 47 (2d Cir. 2000) (finding reversible error where the district court ordered restitution in the same amount used in offense-level calculations that likely included potential loss) (citing *United States v. Germosen*, 139 F.3d 120, 130 (2d Cir.1998) (citing, *inter alia*, 18 U.S.C. § 3663(a)(1)(A)), cert. denied, 525 U.S. 1083 (1999) (emphasis supplied).

Accordingly, the Court is barred from deriving any restitution award from impermissible "relevant conduct" extraneous to Mr. Butselaar's conviction pursuant to Count Two.

Honorable Cathy Seibel, U.S.D.J.
Re: *United States v. Frank Butselaar*, 22 Cr. 560
January 30, 2025
Page 16

## IV.

## Conclusion

In light of the foregoing, we respectfully ask the Court to impose a sentence of time served. We submit that Mr. Butselaar has been sufficiently punished in this case, and the interests of justice are not further promoted by sentencing him to a few additional months of incarceration. He should be released so that he can reunite with his wife and children in the Netherlands, and they can begin the difficult work of restoring some semblance of family life.

Respectfully submitted,

Kerry A. Lawrence
Samidh Guha
Diane M. Fischer

*Attorneys for Defendant Frank Butselaar*

cc: All Counsel of Record