

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*United States Attorney's Office*
*50 Main Street, Suite 1100*
*White Plains, New York 10606*

February 6, 2025

**BY ECF AND EMAIL**
The Honorable Cathy Seibel
United States District Court
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

Re:    *United States v. Frank Butselaar*, S1 22 Cr. 560 (CS)

Dear Judge Seibel:

The Government respectfully submits this letter in advance of the sentencing of defendant Frank Butselaar, scheduled for February 13, 2025. Butselaar was convicted upon his plea of guilty to willfully aiding the preparation of a fraudulent tax return. His conviction arose from a sophisticated scheme that he engineered to cheat the United States out of millions in tax revenues. In furtherance of the scheme, Butselaar used opaque structures to hide his clients' earnings, created fake documents to make his scheme appear legitimate, and repeatedly lied to other professionals and tax authorities to conceal his fraud. Even now, having pled guilty, he still refuses to accept full responsibility for his actions. Indeed, his sentencing submission reads as though he was randomly brought to the United States and targeted for prosecution, never acknowledging his serial lies and misconduct. In truth, as the Court saw over a nearly two-week trial, Butselaar was charged, extradited, prosecuted, and ultimately convicted because he was guilty of spearheading a long running, international fraud scheme that cost the American public tens of millions in tax revenue. Butselaar has proved himself to be an unrepentant and sophisticated fraudster, and the Court should impose on him the maximum permitted sentence:  36 months' imprisonment.

A.    **Background**

    1.    **Facts**

***Overview of the Fraudulent Scheme***

Frank Butselaar helped fraudulently conceal from the IRS over $70 million in reportable income for ultra-high-net-worth individuals. Butselaar was repeatedly told by other tax professionals and lawyers that he was violating U.S. tax laws; he claimed that various transactions took effect before they really had; he lied to other advisors; and he worked to replace those who questioned his concealment strategies with his co-conspirators. Butselaar knew that he was breaking the law. But he did it anyway to boost his professional standing and build a client base in industries that are driven by word-of-mouth recommendations. In short, the proof demonstrates

that Butselaar knowingly and willfully committed tax fraud for two sets of clients: electronic dance music disc jockeys ("EDM DJs") and fashion models.

In 2008, Butselaar was a shareholder in the Amsterdam office of Greenberg Traurig LLP, a large international law firm. *See* PSR ¶ 12. While there, he developed a reputation as a top tax professional, adept at devising solutions for clients who earned money across the world. PSR ¶ 12. That year, Butselaar took on as a client Tijs Verwest, a/k/a "DJ Tiesto," who in Butselaar's words was the "number 1 DJ in the world." GX B-5. Like models and other musicians, EDM DJs make their living largely through live performances. PSR ¶ 13. As EDM grew in popularity, DJs began touring across more countries, sometimes earning hundreds of thousands of dollars or more in a single night. *Id.* So, for DJs like Verwest, EDM's growth led to substantial earnings and fame. And with that burgeoning business also came added taxes and financial complexity. *Id.* That complexity caused Verwest's then-business manager to turn to Butselaar for guidance. *Id.*

Butselaar took on Verwest and quickly advised him to emigrate from the Netherlands to the United States and adopt a new international corporate structure. PSR ¶ 14. This structure was, at its core, designed to separate Verwest's U.S. and international income. Butselaar's structure had several interrelated parts, as described below. *Id.*

- First, Verwest was to create a wholly owned U.S.-based company (LA All the Way) that would serve as the contracting entity for all Verwest's U.S. performances. Verwest's U.S.-sourced income would be paid to LA All the Way and reported to the IRS.

- Second, Verwest would create a Cypriot entity (After Midnight Productions Ltd.) to serve as the contracting party for Verwest's non-U.S. activities. Verwest's international performance income would be paid to After Midnight Productions and not reported to the IRS.

- Third, Verwest's name and likeness rights—*i.e.*, IP rights that Verwest had in his appearance—would be transferred to a holding company incorporated in Guernsey (Safe From Harm Ltd.). Those rights, through a variety of contractual arrangements, would then be licensed to the Cypriot and American companies.

- Fourth, Verwest would sign employment agreements with the Cypriot and Guernsey companies and be paid annual salaries by each.

- Fifth, and finally, the Guernsey and Cypriot entities would be nominally owned, not by Verwest, but by a Guernsey Trust called Safe From Harm Trust (those three entities collectively, the "Offshore Structure"). Verwest would be the beneficiary of the trust as well as the trust's "Appointer," meaning Verwest had the power to replace the trustee.

Because the United States taxes residents on worldwide income, Butselaar was careful from the outset to advise Verwest to stay under the "minimum number of days in the United States"

each year to avoid becoming a "US tax resident."[1] PSR ¶ 15. As a result, by advising Verwest to leave the Netherlands for the United States but to stay below the U.S. day-count threshold, Butselaar's goal was for Verwest to avoid becoming a tax resident in any jurisdiction, making him, in colloquial terms, a "tax nomad." *Id.* As a non-resident, Verwest had to pay U.S. taxes only on the money he made here in the United States (*i.e.*, the money collected by LA All the Way, his U.S. company). PSR ¶ 16. But if Verwest were to ever become a tax resident, he would be required to pay U.S. taxes on his worldwide earnings. *Id.* That would include not just the money made in LA All the Way, but also the money made in After Midnight Productions, which was funneled to the Safe From Harm Trust. *Id.* And due to U.S. "Subpart F" rules, which are specifically designed to prevent U.S. taxpayers from avoiding taxes by parking money in so-called "controlled foreign corporations," Verwest would owe taxes on that money even if it was never distributed to him. *Id.*

In 2009, Butselaar worked with Verwest's other advisors to set up the Offshore Structure. PSR ¶ 17. Those other advisors included two Certified Professional Accountants ("CPAs") at Gelfand, Rennert and Feldman, a U.S. business management firm. *Id.* In addition, Butselaar brought in other professionals to provide back-office support for the Offshore Structure— professionals that he would continue to turn to for other clients. PSR ¶ 19. Those professionals included a Trustee in Guernsey (Grant Howitt at Intertrust) and a Cypriot accountant (Loizos Kountouris) to manage the day-to-day affairs of the Cypriot company. *Id.*

Butselaar's representation of Verwest inured to his benefit in the EDM world. In mid-2011, for example, Butselaar was approached by the management of another well-known EDM DJ, Nick van de Wall, p/k/a "Afrojack" (together with Verwest, the "DJ Clients"). PSR ¶ 20. Van de Wall decided to hire Butselaar in large part because Verwest recommended him. *Id.* And in 2012, Butselaar implemented an Offshore Structure for van de Wall that mirrored the structure he created for Verwest, using the same professionals. PSR ¶ 21. The one exception was the U.S.-based accountants:  van de Wall employed David Weise & Associates ("DWA"), not Gelfand. PSR ¶ 22.

Shortly after Butselaar implemented Van de Wall's structure, problems began to arise. PSR ¶ 23. Between late 2012 and early 2013, it became clear that both Verwest and Van de Wall had spent too many days in the United States in 2012, meaning they would likely become U.S. resident taxpayers, required to report and pay taxes on their global earnings in the Offshore Structure—a reality of which Butselaar was aware from the very inception of Verwest's Offshore Structure. *Id.*

To that point, Butselaar's Offshore Structure had offered significant tax savings. But the structure was not designed for the DJ Clients' shifting circumstances, and it offered little value when they became U.S. tax residents required to pay tax on worldwide income. Instead of admitting to his clients that his structure no longer worked, Butselaar chose to lie—he elected to keep his business going by fraudulently concealing the DJs' income from the IRS. PSR ¶ 23.

For Verwest, Butselaar and his co-conspirators proposed a simple switch: Verwest would be nominally removed as beneficiary of the Guernsey Trust that sat atop the Offshore Structure and replaced by a straw beneficiary until he was no longer a U.S. resident. PSR ¶ 24. This would

---

[1]     A non-permanent resident foreign national becomes a U.S. resident taxpayer only if, among other things, he spends more than a certain number of days in the United States over the past three years. *See* 26 U.S.C. § 7701(b)(3).

mean that, even though Verwest was going out, night after night, to perform the shows that generated the money flowing up to the trust, on paper, he would not be the owner of that money. That would remain the case until Verwest stopped residing in the U.S., at which time the straw owner would be removed and the money would go back to Verwest. PSR ¶¶ 24–25. As Butselaar summarized: "[w]hen the artist spends too many days in the US, we take him out of the Trust and bring him back as soon as he finishes his US tax obligation." PSR ¶ 25. The whole point of this swap, according to Butselaar, was to hide the DJ's "direct or indirect control" of the Offshore Structure. *Id.* In Verwest's place, Butselaar and Verwest's other advisors installed a charity called Stichting Elements of Life, which they themselves created and controlled. *Id.* Despite this nominal change, in truth, Verwest remained at all times the real beneficiary of his trust. *Id.*

There was a further problem that Butselaar had to address: by the time he created the nominee scheme in mid-2013, Verwest had already become a U.S. tax resident. PSR ¶ 26. In particular, Verwest had exceeded the day count and was thus deemed a U.S. tax resident for 2012, a year in which Verwest had also explicitly been the on-paper beneficiary of the Guernsey trust. *Id.* Regardless, and as further proof of the sham nature of Butselaar's beneficiary swap, Butselaar's advice and direction ultimately led to the filing of a 2012 U.S. resident tax return falsely claiming that Verwest was not the owner of the Offshore Structure at any point in 2012. *Id.*

For van de Wall, Butselaar simply arranged to lie to the IRS about the DJ's residence. PSR ¶ 27. Specifically, in the summer of 2013, DWA, Van de Wall's then-business manager, notified Butselaar that van de Wall had spent too many days in the United States in 2012 and would need to file taxes as a U.S. resident. DWA then told Butselaar that they were therefore going to declare van de Wall a U.S. tax resident unless Butselaar was going to file van de Wall as a tax resident in the Netherlands for all of 2012.[2] *Id.* To convince DWA to forego filing a U.S. resident return, Butselaar agreed that he would file van de Wall's Dutch taxes declaring him to be a resident of the Netherlands for the full year. PSR ¶ 28. But that was false—he did no such thing. PSR ¶¶ 28–29.

In 2013, Van de Wall remained a U.S. tax resident. PSR ¶ 30. So, in October 2013, Butselaar adopted for Van de Wall the same nominee-beneficiary scheme he implemented for Verwest, purportedly removing Van de Wall as the beneficiary of his own trust, and making van de Wall's mother the sole on-paper beneficiary. *Id.* Following this nominal switch, Butselaar wrote to Van de Wall's team that "the [Offshore] structure has now been adapted so that the 'European Side'"—meaning the non-U.S. income earned by Van de Wall—"will not be subject to American taxation despite the fact that [Van de Wall] spent too many days in the US in 2013." *Id.* And as before, despite Van de Wall having been, even on-paper, the clear beneficiary of the Offshore Structure's trust for well over half of 2013, Butselaar counseled Van de Wall's management team to file taxes that left off Van de Wall's ex-U.S. income. *Id.*

But Butselaar's attempt to paper over Van de Wall's ownership of his trust was immediately (and appropriately) rejected by DWA. PSR ¶ 31. Glenn Frank, one of the CPAs from

---

[2]    Even when someone spends enough time in the United States that they would qualify as a U.S. tax resident in a given year, it is possible to file them as a non-resident if they have a "closer connection" to another country. In this case, DWA told Butselaar that van de Wall could declare a closer connection to the Netherlands in 2012, but only if he was a tax resident of the Netherlands for the full year. PSR ¶ 27 & n.3.

DWA, wrote to Butselaar that it appeared "essential" to Butselaar's Offshore Structure that Van de Wall not become a U.S. tax resident "to avoid not being liable for US taxes on worldwide income." GX A-131; PSR ¶ 31. A few weeks later, Glenn Frank followed up with an email warning Butselaar that the income collected in the Offshore Structure appeared to be reportable under "the CFC (controlled foreign corporation) and Subpart F rules," GX E-8; PSR ¶ 32, which require U.S. resident taxpayers to report certain income earned by foreign companies that they own and control, *see, e.g.*, 26 U.S.C. §§ 951, 957, 958.

DWA sought a second opinion to check its work. To that end, DWA turned to a renowned international tax lawyer, Charles Kolstad, then working at an international law firm, Venable LLP. PSR ¶ 32. Kolstad immediately identified, in an email provided to Butselaar, issues relating to a foreign trust being "established within 5 years of [Van de Wall] ... becoming a US tax resident"— a reference to U.S. Grantor Trust rules, as well as Subpart F rules, making the Offshore Structure reportable. GX A-138T; PSR ¶ 32. On the latter point, Kolstad noted that regulations under Subpart F specifically "address devices" that nominally seek to "decontrol [] compan[ies]" by shifting voting power from the taxpayer to a nominee. *Id.* As Kolstad explained, the IRS was "unlikely" to "respect" the fiction that Van de Wall's mother now owned his money. GX A-138T; PSR ¶ 32.

DWA pressed further. After this exchange, Kolstad, Butselaar, and others had a phone call to discuss the taxability of Butselaar's structure. PSR ¶ 33. On the call, Kolstad told Butselaar, in part, that filing taxes without disclosing the money in van de Wall's Offshore Structure would amount to tax fraud. *Id.* Kolstad also offered Butselaar every opportunity to provide facts that may sway his opinion. But Butselaar provided no such facts and continued with his illegal scheme.

In a desperate effort to keep a star client, DWA proposed seeking a third opinion. PSR ¶ 34. Seeing a potential opening, Butselaar steered DWA towards Margaret Marshall, a non-tax lawyer at his former law firm (Greenberg Traurig).[3] *Id.* Butselaar then quickly began working behind the scenes to take control of this supposed neutral-party review. *Id.* Unbeknownst to DWA, Butselaar secretly reached out to Marshall and suggested that he could "help [her] with the tax part" of the opinion, and that his involvement "w[ould] not be disclosed to [DWA]"—in other words, Butselaar offered to secretly write an opinion, supposedly coming from a third party, blessing his own illegal structure. *Id.* Despite Butselaar's efforts (including, as discussed below, doctoring trust documents), Greenberg Traurig agreed with Kolstad (and DWA) that the money in the Offshore Structure was reportable now that Van de Wall was a U.S. resident. PSR ¶ 37. To avoid any doubt, Marshall sent Butselaar an annotated copy of the Tax Code's statutory provisions and implementing regulations for "Grantor Trusts" and told Butselaar that the highlighted statutes and regulations rendered the trust taxable.[4] *See* GX G-142; Trial Tr. at 480:25–482:24 (M. Marshall). The annotations focused on the regulations that made plain that foreign trusts settled by a U.S. taxpayer (such as Van de Wall), which could also be amended to provide for a U.S. beneficiary in any given year (like Van de Wall's trust), were taxable to the U.S. taxpayer/settlor.

---

[3]    At the end of 2013, Butselaar had changed law firms.

[4]    Butselaar was already familiar with these rules, as he had been told about them in a December 2012 email from yet another business manager, Thomas St. John. In that email, St. John told Butselaar that "[g]rantor trusts" did not make the income being collected by the Offshore Structure unreportable. GX G-84.

GX G-142. Accordingly, by September 2014, Butselaar had been told expressly by Greenberg Traurig, Venable, DWA and others that his scheme—to swap out beneficiaries for nominees—was prohibited by Subpart F and ineffective under U.S. Grantor Trust regulations. PSR ¶ 38.

Still undeterred, Butselaar pressed on in the face of the parade of professionals telling him his actions were illegal. Because DWA refused to go along with his scheme, Butselaar advised Van de Wall's team to simply replace them, steering Van de Wall instead to Gelfand. PSR ¶ 39. Thereafter, Butselaar counseled the filing of a tax return for Van de Wall with the IRS that omitted mention of the income from the Offshore Structure. *Id.*

Over the next few years, Butselaar and others worked to file additional returns for Verwest omitting millions of dollars arising from his international income. PSR ¶ 40. And thus, even though Verwest remained a U.S. tax resident for multiple years, performing all over the world, only income from shows that he performed while physically in the United States was reported.

Importantly, at all points, despite the nominal change to the beneficiary, Butselaar knew that the DJ Clients were the real beneficial owners of the Offshore Structures—and, as a consequence, that the earnings in the Offshore Structures had to be reported to the IRS. PSR ¶ 41. For example, even though Verwest's trust was owned, on paper, by a charity, Butselaar regularly recommended that Verwest's commercial affairs, including personal investments and payments to members of his entourage, be run through the structure. *Id.* Butselaar likewise made plans, documented in contemporaneous emails and memos, to make large-scale payments to Verwest out of the Offshore Structure once he stopped residing in the United States. *Id.* As with Verwest, even though Van de Wall's mother was the supposed beneficiary of his trust, Butselaar and others regularly sought Van de Wall's approval before making investments out of his Offshore Structure. *Id.* Butselaar and others also used the structure to help Van de Wall pay for luxury goods and settle gambling debts, despite Van de Wall supposedly not owning his money (at least on paper). *Id.*

Eventually, the scheme fell apart. In March 2018, a criminal investigation by Dutch authorities into Butselaar became public. PSR ¶ 42. Verwest then sought a second opinion on the Offshore Structure's reportability with yet another prominent international law firm, Kramer Levin. *Id.* After reviewing the documents, two partners at Kramer Levin—Howard Rothman and Pamela Capps—advised Butselaar and others, consistent with the litany of advice that Butselaar had previously received, that the money in Verwest's Offshore Structure was reportable under U.S. Grantor Trust rules. *Id.* Nevertheless, Butselaar wrote an email to Gelfand directing them to file Verwest's 2017 tax return without disclosing the Offshore Structure. *Id.* In the wake of the Dutch criminal investigation and Kramer Levin's analysis, Verwest eventually fired Butselaar. *Id.*

Butselaar's evasion strategies were not limited to the DJ Clients. He and others executed the same playbook for several fashion models (the "Fashion Industry Clients"), including Patrica van der Vliet, Daria Strokous, and Ginta Lapina. PSR ¶ 43. Like the DJ Clients, Butselaar counseled the Fashion Industry Clients to set up a bifurcated structure, with a U.S. entity collecting U.S.-sourced income and a Cypriot entity collecting income earned outside the United States. *Id.* Unlike the DJ Clients, however, there was no trust; instead, the Cypriot companies were simply owned by the Fashion Industry Clients themselves. *Id.*

As he was counseling the DJ Clients to file fraudulent tax returns, Butselaar began to implement an even simpler version of the scheme for the Fashion Industry Clients. To obfuscate the Fashion Industry Clients' control over their international income should they become U.S. residents, Butselaar again proposed installing a nominee. PSR ¶ 44. In particular, Butselaar proposed that the models purportedly transfer ownership of the Cypriot companies collecting their international income from themselves to a trusted representative, such as a sibling. *Id.* Thus, all of a sudden, all of the money that the models were earning outside of the United States would supposedly be owned by their brothers or sisters. But as with the DJ Clients, despite changing the name on their companies' stock, all parties involved understood that the money the models were making would continue, as a matter of substance, to belong to the models themselves. *Id.*

Butselaar laid out this proposal in virtually identical memos that he sent to at least two Fashion Industry Clients. As Butselaar explained: if a model becomes a U.S. resident taxpayer, "the main question [for the IRS] will be who [is] the shareholder of [the] Cypriot company." PSR ¶ 45. As a result, if the model nominally "own[ed] the shares of this company" it would be a "useless structure" since the IRS would tax the model "as if the company does not exist." *Id.* To avoid that outcome, Butselaar suggested obscuring the models' ownership of their companies by transferring the shares to a "non-US trusted representative"—in most cases, a sibling or even Loizos Kountouris, the Cypriot accountant to whom Butselaar steered clients. *Id.* Butselaar assured the models that, despite supposedly giving the company to someone else, "annual accounts and dividend payments"—*i.e.*, the money the models earned—would continue to flow to them as the "100% economic owner[s]." *Id.*

To leave no doubt about who really owned the money in the models' companies, Butselaar typically had the models obtain signed but undated reverse share transfer documents from their nominees allowing them to freely take back their companies whenever they wanted. PSR ¶ 45. In other words, a model who supposedly gave her company to a sibling could simply take the company back if the sibling did something the model did not want. The practicalities of this arrangement were explained to one model as follows, making clear that the "change" in ownership was only a change on paper:

> The instrument of transfer allows you to reverse the [share] transfer and have the shares back in your name if for example you have a fight with your brother. . . . When you transfer the shares you basically lose control of the company and we as directors of the company are not obliged to follow your instructions and provide you with any company information. You only remain as employee while [your brother] assumes the full rights you previously had. The authorisation [*sic*] letter when signed by [your brother] will give you full authority to act as you did in the past apart from transferring the shares back in your name. The transfer of shares is covered by the second instrument of transfer as explained above.

GX B-157 at 1–2.

Notably, one model who was considering retaining Butselaar spoke to a partner at Gelfand who did not work directly with Butselaar on his DJ Clients, Todd Kamelhar. PSR ¶ 46. Kamelhar

was immediately concerned by Butselaar's proposal and consulted another reputable international tax lawyer who shared Kamelhar's concerns. *Id.* After that, in June 2016, Kamelhar told Butselaar in no uncertain terms that his proposal did not work—that it constituted "nominee ownership and would not avoid US reporting requirements." B-366; PSR ¶ 47. In so doing, Kamelhar also sent Butselaar a recent *New York Times* article on efforts by the United States Government to crack down on tax evasion. *See* I-64 (article on the Panama Papers that Kamelhar linked in his email to Butselaar). Still undeterred, Butselaar continued pursuing this scheme with other clients.

### *Select Lies to Other Professionals and Tax Authorities*

Butselaar's scheme, at base, was premised on preventing his clients' worldwide income from being taxed in any one jurisdiction. To effectuate that scheme, and to keep it secret from authorities, Butselaar repeatedly resorted to lying to other professionals and tax authorities about a variety of topics. Notable examples include the following:

Fraudulent Trust Document: In April 2014, in an effort to silence DWA and convince them to file van de Wall's 2013 tax return without disclosing van de Wall's offshore earnings, Butselaar sought to secure a tax opinion from his former firm, Greenberg Traurig, that the Offshore Structure was not reportable. On April 1, 2014, Butselaar reached out to Grant Howitt and asked for trust documents because Greenberg Traurig "want[ed] to check whether Nick [van de Wall] [wa]s out of the trust." GX H-76 at 1. Butselaar made clear, however, that if he thought the document "might hurt [van de Wall's] tax position in the US, [he] w[ould] not forward it." *Id.* In response, Howitt sent Butselaar a deed of removal, showing that van de Wall had been removed from his trust (at least on paper) in October 2013. *Id.* at 1, 3–5. Four days later, Butselaar sent the deed of removal to Greenberg Traurig, but with a change—he backdated the document to October *2012*. *Compare* GX-76 at 3, *with* GX-127 at 18; Trial Tr. at 1134:1–1136:1 (G. Howitt) (testifying that the deed of removal Butselaar sent to Greenberg Traurig was not legitimate and appeared to be a forgery).



| GX-76 at 3 | GX-127 at 18 |

With the stroke of a pen, Butselaar made it seem as though Van de Wall had not been a beneficiary of his trust at any point in 2013, the tax year that Greenberg Traurig was tasked with reviewing. And in an apparent effort to ensure that his fraud remained hidden from Howitt, Butselaar cautioned Greenberg Traurig that he "was not allowed to send these documents" and that they are "extremely confidential"—a clear lie, given that Howitt had given this document to Butselaar

specifically so that it could be shared with Greenberg Traurig. *See* GX-127 at 1; *see also* Trial Tr. at 1133:4–6 (G. Howitt) (testifying that he did not "tell Butselaar that [Butselaar] wasn't allowed to send these documents to Greenberg Traurig").

Van de Wall's Residence: As described above, in 2013, Butselaar lied to DWA about van de Wall's residence status in the Netherlands. Specifically, after DWA told Butselaar that Van de Wall would need to file taxes as a U.S. resident given the number of days he spent in the United States, Butselaar raised the prospect of declaring van de Wall to have a closer connection to the Netherlands. When DWA noted that, given his recent emigration, the only way a closer connection could be established was if van de Wall was filing as a Dutch resident taxpayer for the entire year, Butselaar confirmed that he would be making this filing. But that was a lie. Below is an excerpt of a Dutch tax record, showing that, in the Netherlands, van de Wall said he was a U.S. (not Dutch) resident from May 14, 2012 through the end of the year. *See* USAO_00112004 (the Dutch word "woonland" means "country of residence," and the word "woonachtig" means "resident").

| | Aangegeven | Correcties voorvastgesteld | Voorvastgesteld | Correcties vastgesteld | Vastgesteld |
|---|---|---|---|---|---|
| 1 Deel van het jaar in buitenland gewoond | | | | | |
| Landcode en periode | | | | | |
| landcode woonland ## | USA | | USA | | USA |
| periode woonachtig in woonland ## B | 14-05-2012 | | 14-05-2012 | | 14-05-2012 |
| periode woonachtig in woonland ## E | 31-12-2012 | | 31-12-2012 | | 31-12-2012 |
| Landcode nationaliteit | NLD | | NLD | | NLD |

In other words, Butselaar engineered a scenario where van de Wall told the Dutch that he was residing in the United States, and the U.S. that he was residing in the Netherlands. After tricking DWA into making this filing, Butselaar gloated to other members of van de Wall's advisory team, remarking how "easy" it had been to pull off his fraud. Attached as Exhibit A are various emails between Butselaar, van de Wall's European team, and members of DWA, regarding this issue.

Lying to Greenberg Traurig About a "Fix": In October 2014, around a month after telling Butselaar that the Offshore Structure did not work, Margaret Marshall asked Butselaar how he ended up handling van de Wall's tax return. Butselaar responded that "Stanley Lim and Ronald Nash [(of Gelfand)] had determined a fix for the trust." Trial Tr. at 488:5–15, 489:1–4 (M. Marshall). That was a lie. Neither Lim nor Nash (nor anyone else, for that matter) made any changes to van de Wall's trust between the period when DWA, Charles Kolstad, and Greenberg Traurig all told Butselaar that van de Wall's offshore structure was reportable, and the time when van de Wall's 2013 tax return was filed. Butselaar was simply trying to cover up the fact that he had intentionally acted in contravention of Greenberg Traurig's guidance and pushed forward with having a tax return submitted to the IRS that he knew to be fraudulent.

Made-Up Tax Opinion: In 2018, Tijs Verwest retained Kramer Levin to review the legality of his Offshore Structure. As that review process unfolded, Butselaar suggested (falsely) that he'd previously received a tax opinion from a U.S. firm that the Offshore Structure was not reportable in the U.S. Specifically, on August 14, 2018, Butselaar emailed another member of Verwest's team and told him that "G[reenberg] T[raurig] Atlanta wrote a legal opinion, not for Tijs but for Afrojack," GX A-357T, suggesting that Greenberg Traurig gave Butselaar written confirmation that van de Wall's near-identical Offshore Structure was not reportable. But that, of course, was

false. Not only did Greenberg Traurig not prepare a written legal opinion concluding that van de Wall's Offshore Structure was not taxable, but they gave the exact opposite advice—telling Butselaar that the structure did not work and was taxable. *See* GX G-141; Trial Tr. at 478:25–479:15, 480:8–11, 482:16–24, 487:25–488:4 (M. Marshall). Butselaar's suggestion in 2018 that Greenberg Traurig had somehow blessed his structure, when in fact it had reached the opposite conclusion, was simply a naked lie designed to apply a veneer of legitimacy to a fraudulent scheme.

<u>Sham Charity:</u> In May 2013, Tijs Verwest was nominally replaced as beneficiary of his trust by a charity, Stichting Elements of Life. *See* GX H-48. That swap was simply a paper transaction to cover up the true ownership of the trust while Verwest was a U.S. resident. Indeed, Elements of Life was not even incorporated until a month before it was made a trust beneficiary, *see* GX H-48 at 7–8 (charity incorporated in April 2013, and made a beneficiary in May 2013)—and only after Butselaar realized that a beneficiary swap was necessary to hide this money from the IRS, *see* GX H-36; Trial Tr. at 178:23–180:18 (T. Verwest) (explaining that a decision to remove Verwest as a beneficiary was made around December 2012). Showing the sham nature of the swap, for years after it was installed as a beneficiary, Butselaar resisted distributing any money to Elements of Life—even a "nominal" sum—finally relenting only when he learned that, due to incoming FATCA rules, the trust, and Verwest's relationship to it, could come under IRS scrutiny. Attached as Exhibit B is a compilation of various relevant emails between Butselaar, Grant Howitt, and others, on this topic.

<u>Fake Apartment Lease in Cyprus:</u> To support a false claim that, at one point, van de Wall was living in Cyprus, Butselaar and others had van de Wall execute a lease pretending that he was living in a residential apartment on the island. *See* GX A-257 at 4–6; GX A-166. But that was a lie. Not only was the apartment lease fraudulently "backdated," Trial Tr. at 1356:15–19, 1357:17–19 (L. Kountouris) (admitting that the lease was backdated); GX A-166 at 2 ("We have to decide on whether we are proceeding with a Cyprus address by tomorrow in case a backdated rental agreement is necessary"), the lease as a whole was a sham. Both Kountouris (the lessor) and van de Wall (the lessee) testified that van de Wall had never even been to this residential apartment. Trial Tr. at 1357:20–1358:16 (L. Kountouris); Trial Tr. at 379:20–380:10 (N. van de Wall). In fact, van de Wall never even got the keys. Trial Tr. at 1358:3–6 (L. Kountouris). Indeed, over his entire life, van de Wall has only visited Cyprus three times. Trial Tr. at 380:1–8 (N. van de Wall). Instead, Butselaar and others used the apartment to try to trick tax authorities. For example, Butselaar pointed to the apartment in discussions with Dutch tax authorities to convince them that van de Wall had few connections to the Netherlands.[5] *See* GX F-15T at 1. ("I am arguing that [van de Wall] is not taxable in the Netherlands because the center of his social and economic life is not in the Netherlands. And in that context, I am also sending you the rental agreement of the apartment in Cyprus."); *see also* Trial Tr. at 381:13–382:11 (N. van de Wall) (testifying that he never told Butselaar to make those representations to the Dutch tax authorities). And the fake lease was provided to Intertrust (the company managing van de Wall's trust) as "proof" that van de Wall was living in Cyprus. *See* GX A-257; *see also* Trial Tr. at 1356:22–1357:16 (L. Kountouris).

---

[5]     Dutch tax residency, unlike U.S. tax residency, is a holistic assessment without regard for a set threshold of days spent in the country.

Lying About Who Owned a Ferrari: In February 2013, after formally emigrating from the Netherlands, van de Wall purchased a Ferrari and crashed it while back in the country. *See* Trial Tr. at 375:7–22 (N. van de Wall). To hide van de Wall's ownership of a substantial asset in the Netherlands (which the Dutch tax authorities could use to argue that van de Wall was still a tax resident), Butselaar, as was his practice, suggested that van de Wall simply lie. According to Butselaar, van de Wall could "spin the story and say that the car was really a present for [van de Wall's mother] and [van de Wall] just wanted to take it for a ride." GX A-95T at 3. But as Van de Wall testified, this Ferrari was not a present for his mother—the car belonged to him. *See* Trial Tr. at 376:7–13, 423:2–6. Butselaar was simply telling Van de Wall, in black and white, to lie.

Lies About a Fashion Model Client's Residence: As noted, Butselaar's lies were not confined to his DJ Clients. His scheme also involved various Fashion Model Clients, including Patricia van der Vliet. For instance, Butselaar admitted in a letter to van der Vliet's father that, although van der Vliet was actually a U.S. resident (and therefore should have been reporting her worldwide income to the IRS), Butselaar was pretending that she was still a Dutch resident. *See* GX F-13T (excerpt below).

> Attached is Patricia's 2013 return. As you know, this is actually a weird return, because we are acting as if Patricia is a tax payer in the Netherlands, whereas she actually is not. We both know the reason why.

As the letter reflects, Butselaar again acknowledged, in writing, that he was pretending that his client was residing in one jurisdiction, when he actually knew that she was residing in another.

## 2.     Procedural History

In October 2022, a grand jury indicted Butselaar for the above-described schemes. On March 14, 2023, at the request of U.S. authorities, Italian authorities arrested Butselaar at his second home in Valfabbrica, Italy. After his arrest, Butselaar contested extradition in the Perugia Court of Appeal, forcing Italian prosecutors to hold a lengthy hearing on the Government's allegations. On or about July 11, 2023, the Perugia Court of Appeal issued a favorable decision on the Government's extradition request. On or about October 2, 2023, three months later, the defendant arrived in the Southern District of New York for his initial appearance.

On September 17, 2024, a grand jury returned a pre-trial Superseding Indictment against Butselaar for the same charges and scheme as the initial October 2022 Indictment. A jury trial began on November 4, 2024. On November 14, 2024, a day before the Government was scheduled to rest, Butselaar pleaded guilty to one count of violating 26 U.S.C. § 7206(2), and admitted to knowingly aiding and assisting in the filing of a fraudulent tax return—specifically, van de Wall's Form 1040 for the 2013 tax year.

In his papers, Butselaar tries to spin his mid-trial plea, suggesting (falsely) that the Government's decision to permit him to plead to a single count for violating Section 7206 somehow evinces a lack of faith in its case. *See* Def. Memo at 12–13. Nothing could be further from the truth, and, given Butselaar's decision to put this at issue, the Government is now compelled to correct the record.

Far from suggesting lack of confidence in its case, it was *Butselaar's team* who approached the Government and asked for a plea after seeing the evidence that he had fraudulently altered a trust document. After the defense made this request, the parties engaged in negotiations over the statutory maximum for the count to which Butselaar would plead. After reaching an impasse, on the morning of November 14, 2024, Butselaar's counsel made an emotionally-laden pitch to the Government ████████████████████████████████████████—for a plea to a count with a three-year maximum. In light of, principally, this emotional presentation, Butselaar's advanced age, and his open criminal case in the Netherlands, the Government elected to extend a plea to the § 7206(2) count. Nothing in the Government's decision to make this offer resulted from doubt in its case. To the contrary, as the Court observed after watching the trial, the evidence was "clear to the jury." Trial Tr. 1436:8–13. And that is because overwhelming evidence established Butselaar's guilt on all counts. The Court should place no weight on Butselaar's post-hoc, disingenuous efforts to spin the Government's act of leniency as a reflection of concern. Instead, the Court should see this tactic for what it is: proof that Butselaar remains unrepentant for his crimes.[6]

The PSR calculates Butselaar's total offense level at 30 and his criminal history category at I, *see* PSR ¶¶ 53–65, resulting in a Guidelines range of 97 to 121 months' imprisonment. However, because the count to which Butselaar pleaded guilty carries a statutory cap of three years, the Applicable Guidelines Range is that cap: 36 months' imprisonment.

Butselaar contests the Guidelines calculation in the PSR, arguing that his offense level should be 20, which would result in a Guidelines range of 33 to 36 months' imprisonment. Def. Memo at 11, 13–14. He then asks the Court for a downward variance, seeking a sentence of time served, which, at this point, would be about 16 months in federal custody.

**B.    Discussion**

**1.    Applicable Law**

As the Court know, the Guidelines still provide important guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Indeed, although *Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court has stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines

---

[6]    Defense counsel has also claimed at both the plea hearing and in its sentencing submission, that the Government took a hand in drafting Butselaar's allocution. *See, e.g.*, Def. Memo at 14. That is not true. The Government insisted that Butselaar admit certain facts as part of his plea that were not elements of the charged crime, as the Government viewed those admissions to be critical to this sentencing, including with respect to the scope of relevant conduct and restitution. That admission was addressed in a footnote in the plea agreement. The Government never told defense counsel that this admission needed to be included in Butselaar's allocution. Nor did the Government see a copy of that allocution in advance of the plea hearing.

range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)-(7). *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

## 2.    The Applicable Guidelines

The parties dispute two issues concerning the appropriate Guidelines calculation.

*First*, the Court should include, as relevant conduct, tax loss associated with Verwest's Offshore Structure, which raises the offense level from 22 to 30. As the Court saw, the evidence at trial demonstrated beyond a reasonable doubt (and far beyond the preponderance standard applicable at sentencing) that Butselaar knowingly and intentionally installed a nominee beneficiary to conceal taxable income in Verwest's Offshore Structure, despite Verwest continuing to maintain complete and utter control over both his trust and Cypriot company, and that he did so to evade reporting Verwest's worldwide income to the IRS.

For example, Loizos Kountouris (a director of the Cypriot company on paper) testified to the following:

- Verwest was the beneficiary of the trust and the ultimate owner of his Cypriot company, and the entire purpose of this structure was to benefit Verwest, which never changed between the structure's formation and 2018, despite the nominal removal of Verwest as beneficiary in 2013. Trial Tr. at 1243:1-13, 1242:23-25, 1244:4-12, 1248:11-13, 1406:5–1407:12 (L. Kountouris).

- Verwest was the exclusive person making money for the structure. Trial Tr. at 1245:9-17 (L. Kountouris).

- Verwest, and not the board of directors, was the person really in control of the Cypriot company; and, in fact, Verwest could fire board members (such as Kountouris) if he wanted to. Trial Tr. at 1245:23–1247:2 (L. Kountouris).

Kountouris's testimony was corroborated by testimony from both Verwest and Wilfred Dam, a former manager of Verwest's:

- Verwest testified that his U.S. and foreign income were split between two companies (one in Cyprus and one in the United States) and that both entities were ultimately his companies. Trial Tr. 160:21-161:25 (T. Verwest).

- Verwest testified that he was the one generating all the money flowing into the trust and that he was going to be the one benefiting from that money. Trial Tr. 171:4-175:21 (T. Verwest).

- Verwest testified that the Cypriot company was ultimately his company regardless of who formally owned the shares on paper. Trial Tr. 225:14-226:3 (T. Verwest).

- Dam testified that Verwest was in charge of all business activities of the structure. Trial Tr. 69:17-70:4 (W. Dam).

- Dam testified that Verwest was in control of the commercial decisions of the Cypriot entity. Trial Tr. 88:7-14 (W. Dam).

Consistent with the witness testimony, the documentary record left no doubt about who really owned the money in Verwest's Offshore Structure. Before nominally removing Verwest as a beneficiary, Butselaar secured repeated promises (including in writing) from the trustee that Verwest could be added back to the trust following his removal, *see* GX H-36, GX H-41; Verwest, even after he was removed as a beneficiary, was able to provide guidance to the trustee to give his then-girlfriend a large payment out of his trust in the future, *see* GX H-116, GX H-118; the Offshore Structure continued to be viewed as a vehicle through which Verwest could make personal investments, *see* GX B-230, GX B-259; Trial Tr. at 1274:18–1277:13, 1278:22–1280:20 (L. Kountouris); and Butselaar planned to add Verwest back into the trust as soon as Verwest was no longer a U.S. resident (and no longer subject to the same scrutiny from the IRS), GX H-102, GX H-126, GX H-140.

Importantly, Butselaar's direction not to report the money in Verwest's Offshore Structure was not a simple mistake. Butselaar knew full well that omitting this income was unlawful:

- Verwest and Van de Wall's Offshore Structures were virtually identical, and Butselaar was told by numerous lawyers and CPAs that those Offshore Structures were reportable once the DJ Clients became U.S. resident taxpayers. Butselaar received similar advice related to his use of nominee owners for various Fashion Industry Clients' offshore companies. Examples of that advice are reflected in Exhibit C.

- On September 3, 2014, Margaret Marshall sent Butselaar a copy of various tax rules and regulations. Among those were 26 CFR § 1.679-2. In that regulation, a Greenberg Traurig lawyer highlighted, among other language, two example scenarios in which a trust would constitute a grantor trust. Both of those examples unmistakably described aspects of Verwest's trust known to Butselaar. The first example explained that an "oral understanding between [a resident alien/settlor] and the trustee" that a U.S. person can be added as a beneficiary in the future rendered the trust a Grantor Trust (and thus reportable to the grantor/settlor). *See* GX G-142 at 10. Butselaar had precisely that sort of understanding with the trustee for Verwest's trust—*i.e.*, written promises that Verwest could be re-added as a beneficiary in the future if he wished. *See* GX H-36; GX H-41. The second example explained that where a letter of wishes directs the trustee of a foreign trust to provide benefits to a U.S. person (even if couched as "only suggestions and recommendations") the trust is treated as a Grantor Trust. *See* GX G-142 at 10. Again, Butselaar knew that Verwest's trust had precisely that sort of documentation—Verwest executed a letter of wishes in 2017 in which he specifically directed the trustee to provide benefits to his then-girlfriend (a U.S. person) in the future. *See* GX H-116, GX H-118

- Beyond the warnings and information provided to Butselaar, Butselaar's own correspondence and conversations reflected a detailed and sophisticated understanding of the relevant tax rules, including Subpart F and controlled foreign corporation rules. Butselaar's emails also revealed his thinking that he was intentionally using nominee beneficiaries for clients to obscure the true ownership of their income from the IRS. Examples include the communications excerpted in Exhibit D.

In short, much of the same evidence that showed that Butselaar was willfully dodging taxes for Van de Wall (the crime to which he pled guilty) supports finding that he was doing the same for Verwest. Indeed, Butselaar was using the exact same straw beneficiary scheme. And the same people that Butselaar admitted to conspiring with for van de Wall's taxes were also assisting him with Verwest's filings. Given the interconnected nature of this scheme—both the participants and how the scheme was carried out—it is clear that the tax loss associated with Verwest's Offshore Structure is relevant conduct that the Court should consider at sentencing. *See* U.S.S.G. §§ 1B1.3(a)(2), 2T1.1 note 2 ("[A]ll conduct violating the tax laws should be considered as part of the same course of conduct or common scheme or plan unless the evidence demonstrates that the conduct is clearly unrelated."). And as the parties agreed in their plea agreement, that tax loss, when accounting for Verwest's structure, exceeds $25 million. *See* Plea Agreement at 3.

*Second*, and relatedly, Butselaar is entitled to no points for acceptance as the Probation Office found. As set forth above, Butselaar is liable not only for the fraud he committed with respect to van de Wall's taxes, but also with Verwest's taxes. By continuing to refuse to admit to the full scope of his criminality, Butselaar has not "truthfully admitt[ed] . . . relevant conduct for which [he] is accountable." U.S.S.G. § 3E1.1(a). To the contrary, he is requiring the Government to continue to litigate this issue even following his guilty plea. And it is not as though Butselaar's recalcitrance concerns an issue tangential to sentencing. As made clear in the plea agreement, the difference amounts to tens of millions of dollars in tax loss. That not only affects the amount of

restitution Butselaar must pay (discussed more below), but it also lowers the applicable Guidelines range. In such a situation, the Guidelines make clear that acceptance points are not appropriate.

### 3.    A Sentence at the Statutory Maximum is Necessary in this Case.

The Government agrees with the Probation Office that a sentence of 36 months' imprisonment—the maximum sentence the Court may impose—is necessary in this case. Such a sentence is needed to, among other aims, reflect the seriousness of the offense and supply just punishment, promote respect for the law, deter future crimes, and account for Butselaar's history and characteristics.

#### *Seriousness of the Offense and Just Punishment*

The seriousness of this offense is enormous. Butselaar spent years lying to numerous other advisors and tax authorities, to evade reporting tens of millions of dollars of his clients' worldwide income. And he did so after advising his clients specifically to seek out the United States to take advantage of its tax laws.

Tax offenses like Butselaar's are costly and damaging to our nation's system of taxation. *See United States v. Ture*, 450 F.3d 352, 357 (8th Cir. 2006) ("The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system."). The Supreme Court has long recognized that "[t]he United States has relied for the collection of its income tax largely upon the taxpayer's own disclosures rather than upon a system of withholding the tax from him by those from whom income may be received." *Spies v. United States*, 317 U.S. 492, 495 (1943). The orderly operation of government and our society relies on its citizens and residents to report timely, completely, and honestly all taxes they owe, which is why Congress has made it a criminal offense to file false returns or evade income taxes. Indeed, as the Second Circuit has recognized, "tax crimes represent an especially damaging category of criminal offenses," which "strike at the foundation of functioning government." *United States v. Zukerman*, 897 F.3d 423, 427 (2d Cir. 2018) (cleaned up). *See generally Compania General de Tabacos de Filipinas v. Collector of Internal Revenue*, 275 U.S. 87, 100 (1927) ("[t]axes are what we pay for a civilized society. . . .") (Holmes, J., dissenting).

That Butselaar committed these crimes disguised as a respected professional makes this all the more serious.  Not only do these circumstances make the crime harder to detect given that Butselaar's position "provide[d] [him] the freedom to commit a difficult-to-detect wrong," but it denigrates efforts by professionals who advise clients to comply with the law and ultimately works to lower standards across professional actors. *United States v. Thorn*, 317 F.3d 107, 120 (2d Cir. 2003) (internal quotation marks omitted). Respectable tax lawyers do not concoct fraudulent schemes to shelter clients' income. They do not create fraudulent documents. They do not advise clients to lie about who owns their property. They do not advise their clients to pretend that their money belongs to someone else. Butselaar's abuse of his professional position and skill is another factor which compels a sentence of 36 months' imprisonment.

In his submission, Butselaar asks for leniency from the Court in the form of additional time off to account for the period of time he spent in custody awaiting extradition, as well as to address the possibility of being ineligible for certain credits in custody. *See* Def. Memo at 4. But these

factors were already accounted for by the parties' agreement to plead Butselaar to a count with a 36-month cap. Indeed, as noted, absent that cap, Butselaar's conduct would carry a Guidelines range in the vicinity of ten years' imprisonment. While the Government does not believe that such a sentence is necessary given the other mitigating factors (principally Butselaar's age), anything below 36 months would fail to account for the severity of Butselaar's conduct.

### Respect for the Law

Even though Butselaar is likely not a serious case of recidivism given his age and the low probability he is ever again involved in U.S. tax filings, a substantial sentence is nevertheless necessary to promote respect for the law.

Butselaar's sentencing submission makes clear that he feels no guilt or remorse for having broken the law. To the contrary, his primary regret appears to be his supposed inability to "effectively combat" the description the Government (through its presentation of evidence) has painted of him as an "unscrupulous schemer." Def. Memo at 3. To be clear, Butselaar had the opportunity—as all criminal defendants do—to challenge the Government's proof and present a defense.[7] But after seeing that proof at trial, Butselaar elected to forego putting on a defense and plead guilty, admitting under oath to having knowingly committed tax fraud. And the fact that, even now, he continues to refuse to admit the scope of his conduct and instead chooses to portray himself as a victim proves that Butselaar has little respect for the law.

Butselaar has similarly shown a dismissive attitude towards court orders. For example, in his submission Butselaar suggests, with no support, that the Government improperly attempted to silence him and his family, claiming that his wife's response to media questions "ruffled the feathers of the U.S. prosecutors" leading the Government to accuse him of violating the protective order. Def. Memo at 3–4. But that is yet another baseless accusation designed to shift responsibility from himself. To be clear, the Government's ongoing concerns regarding disclosure in this case were caused by one thing and one thing only: the defense camp's repeated disclosures of protected materials. For example:

- On September 23, 2024, the defense publicly filed an exhibit to their response to the Government's motions *in limine*, that was simply a list identifying specific witnesses the Government intended to call at trial, including numerous overseas witnesses whose identities the Government had been working at length to keep non-public to avoid them rescinding their agreement to travel for trial.[8] Following that disclosure, the Government was alerted that certain of its overseas witnesses received media outreaches about this case.

---

[7] It is ironic to hear Butselaar bemoan the fact that his case was a topic of media attention in the Netherlands, *see* Def. Memo at 3, given that he elected to give hours of interviews to a journalist in the Netherlands who has been covering his case.

[8] The defense was no doubt aware of the concerns around publicly identifying overseas witnesses in this case given that the defense previously filed its own affirmative Rule 15 papers under seal to avoid publicly disclosing the name of an anticipated defense witness.

- On October 20, 2024, the defense publicly filed an internal IRS record produced in discovery containing personal identifying information for Tijs Verwest, including Verwest's social security number. That filing led to various news articles discussing Verwest's private tax information, including an article by the Dutch publication Het Financieele Dagblad.[9]

The foregoing, combined with Butselaar's continued refusal to accept full responsibility for his actions, demonstrates that the Court's sentence must be designed to send a message to Butselaar—and other professionals—that thumbing your nose at the law will result in consequences.

### General Deterrence

A sentence of 36 months' imprisonment is critical to satisfy the need for general deterrence. Building and charging cases involving sophisticated international tax frauds is an incredibly difficult and costly endeavor. As the Sentencing Commission explained:

> The criminal tax laws are designed to protect the public interest in preserving the integrity of the nation's tax system. Criminal tax prosecutions serve to punish the violator and promote respect for the tax laws. Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines. Recognition that the sentence for a criminal tax case will be commensurate with the gravity of the offense should act as a deterrent to would-be violators.

U.S.S.G. ch. 2, pt. T, introductory cmt. The need for general deterrence is particularly heightened in tax fraud cases engineered by tax professionals which, as the trial evidence made plain, are easy to perpetrate and difficult to detect. *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *United States v. Hassebrock*, 663 F.3d 906, 922 (7th Cir. 2011) (affirming as reasonable a within-Guidelines 32-month sentence for a tax evader when the district court explained that "a sentence of probation would not promote respect for the law, but encourage people to flaunt it").

This case highlights the difficulty in detecting these sorts of crimes. To marshal the necessary evidence, the Government had to send Mutual Legal Assistance Treaty requests to numerous foreign nations; repeatedly interview and secure travel arrangements for witnesses from all over the globe; collect and review hundreds of thousands of emails from different entities, including multiple sophisticated law firms and tax advisors; and extradite Butselaar from Europe.

---

[9]     *See* L. Zandbergen *et al.*, *Tax data of DJ Tiesto on the street in criminal case against tax specialist*, https://fd.nl/samenleving/1534759/protest-tegen-publicatie-belastinggegevens-tiesto-in-strafzaak-tegen-nederlandse-fiscalist.

In short, making cases of this sort take a monumental amount of effort, a fact which this Court recognized. *See* Trial Tr. 1436:17–18 ("[This case] was a very, very difficult case to build . . . .").

The reality, then, is that many international tax fraud schemes may go undetected. So when the perpetrator of such a scheme is caught and brought to justice, the sentence must be sufficient to make others think twice about violating the tax laws. Sentencing Butselaar to 36 months' imprisonment is necessary to send a message to tax professionals that their use of knowledge and special skill to game the Internal Revenue Code will be met with serious punishment.

### *History and Characteristics*

A principal argument that Butselaar advances for a time served sentence is the hardship imprisonment has caused to Butselaar and his family. *See* Def. Memo at 9–11. But that is true in any crime. Any time someone breaks the law, they know they are risking incarceration.

Butselaar also relies on reputational consequences and letters written by professional and personal contacts as reasons why he deserves a sentence of time served. But sentencing courts typically do not consider claims with respect to standing in the community—or charitable works, to which the defendant does not even allude—to mitigate a sentence. *See United States v. Canova*, 412 F.3d 331, 358-59 (2d Cir. 2005) (standard is "exceptional degree" of public service and good works under § 3553(a)); *cf.* U.S.S.G. § 5H1.11 ("Civic, charitable, or public service; employment-related contributions; and similar prior good works are not ordinarily relevant in determining whether a departure is warranted.").[10] That is in part because many defendants do not have the resources Butselaar had over the course of his career—in time, money, social standing, or power—to develop the network he is now relying on for leniency. So the law is reticent to show leniency to the few defendants who are fortunate enough to have such options. *See, e.g.*, *United States v. Ali*, 508 F.3d 136, 149 & n.17 (3d Cir. 2007) (charitable service is "evaluated with reference to the offender's wealth and status in life" because defendants "who enjoy sufficient income and community status . . . have the opportunities to engage in charitable and benevolent activities." (citations and quotation marks omitted)); *United States v. Crouse*, 145 F.3d 786, 792 (6th Cir. 1998) (no downward departure warranted where a defendant's "community works," while "significant," are "not unusual for a prominent businessman"); *United States v. McHan*, 920 F.2d 244, 247 (4th Cir. 1990) ("[T]o allow any affluent offender to point to the good his money has performed . . . suggests that a successful criminal defendant need only write out a few checks to charities and then indignantly demand that his sentence be reduced.  The very idea of such purchases of lower sentences is unsavory[.]"); *United States v. Fishman*, 631 F. Supp. 2d 399, 403 (S.D.N.Y. 2009) ("[W]hite collar offenders, because of their greater wealth and leadership in the community, enjoy much greater opportunities to participate and rise to prominence in charitable activities, and also possess the means to contribute resources with larger generosity to community

---

[10]     *Canova* is instructive, whether this Court considers this factor under the Guidelines or Section 3553(a). In the appeal in that case, the initial question was whether the defendant qualified for a departure under the Guidelines. *Canova*, 412 F.3d at 358. But because *Booker* had been decided between the defendant's sentencing and appeal, and because the Circuit remanded to the district court on other grounds, the Circuit discussed the propriety of considering the defendant's public service both under the Guidelines and under Section 3553(a). *Id.* at 358–59 & n.29.

service organizations. These social and economic advantages could enable them to gain a substantial edge over blue collar offenders who cannot make claim to comparable means and opportunities with which to mitigate the full impact of a heavy sentence."). If anything, the fact that Butselaar had access to this network of family and friends, and still chose to engage in such brazenly illegal conduct, only further compels a sentence of 36 months' imprisonment.

### 4.    The Court Should Order Butselaar to Pay $19.25 Million In Restitution

Butselaar asserts that no restitution is due or owing for the count of conviction, and that restitution for additional relevant conduct is unlawful. Def. Memo at 14. In so arguing, the defense camp ignores the plea agreement they signed, numerous applicable statutory provisions, and decades of binding Second Circuit law. In short, Butselaar's arguments are frivolous, and the Court should order him to pay $19,250,845 in restitution to the IRS.

Butselaar's first argument—that the IRS cannot have suffered a loss because it has not made a civil determination of tax loss—is nonsensical and contrary to the parties' agreement. The record is beyond clear that the IRS suffered a tax loss. As Butselaar admitted in open court, he aided and assisted in the preparation of a tax return that intentionally omitted "overseas income that [he] knew should have otherwise been reported." Plea Tr. at 23:20–24. It is axiomatic that, absent undeclared or otherwise applicable deductions (of which there are none in this case), unreported income would tend to cause a tax loss. And indeed, the parties stipulated in the plea agreement that the tax loss associated with van de Wall's 2013 tax filing (the filing associated with the count of conviction) exceeds $550,000. Specifically, an IRS revenue agent calculated the tax loss at $697,517, *see* Exhibit E, and that figure is supported by, among other evidence, financial statements showing that van de Wall earned more than $1 million in ex-U.S. income in 2013, which was not reported to the IRS. *Compare* GX A-198 (Van de Wall International Ltd. financial statement), *with* GX B-84 (van de Wall 2013 Form 1040).

Butselaar's argument that "the IRS conducted multiple audits of van der Wall's [*sic*] tax obligations without making any determination of tax deficits or outstanding obligations" is simply a rehashing of a position he took previously and entirely at odds with his guilty plea. The Court has—correctly—previously rejected that position, and it should do so again:

> I don't think . . . [the] inference that the IRS didn't find the structure improper so it must be proper is a fair inference absent any finding on that subject by the IRS, nor would it be the first time that the IRS didn't catch something in an audit, whether out of incompetence, laziness, lack of resources, or just being outgunned. Indeed, the audit notes say specifically . . . that we've decided to put aside the issue, the grantor trust issue, and just focus on the royalties, and as said in *U.S. v. Ray*, 2022 WL 558146, at *7 . . . there are all kinds of reasons why an investigative agency might or might not commence or advance an investigation having to do not only with the quality of the evidence, but also the priorities of the agency and the budget and resources it has to execute on those priorities. . . . In other words, the IRS's non-finding essentially does not mean anything . . . .

Final Pretrial Conf. Tr. at 74:8–75:3.

Indeed, contrary to his current claims, Butselaar agreed in the plea agreement that, at a minimum, he would "make restitution for the amount of additional tax that would have been due and owing were van de Wall to have filed an amended tax return for tax year 2013 including the overseas income referred to in footnote 1 of this agreement." Plea Agreement at pg. 2. The agreement continued by stipulating that "the tax loss relating to the filing of the tax year 2013 return for Nick van de Wall is more than $550,000." Plea Agreement at pg. 3.

Butselaar's second argument—that restitution cannot include relevant conduct, and thus cannot include the tax loss associated with Verwest's Offshore Structure, is flatly contradicted by the binding plea agreement that the defense signed, clear statutory language, and decades of precedent. In particular, as part of his plea, Butselaar expressly agreed to pay restitution not just for tax loss arising from his count of conviction, but also for tax loss linked to Verwest's Offshore Structure for tax years 2012 through 2017, should the Court make certain factual findings. *See* Plea Agreement at pg. 2 (agreeing to make restitution for losses associated with Verwest "should the Court make the finding set forth in Section A.2.a.ii" and citing, among other provisions, 18 U.S.C. §§ 3663(a)(3) and 3663A(a)(3)). That agreement is enforceable against Butselaar.

To suggest otherwise, Butselaar relies on the Supreme Court's decision in *Hughey v. United States*, 495 U.S. 411 (1990), and its progeny, which held that a court can order restitution only for losses caused by the offense of conviction, and not losses tied to relevant conduct. But there is a problem with this argument: it relies on a version of the Victim and Witness Protection Act that has been obsolete for over three decades.

In 1990, Congress amended the Victim and Witness Protection Act to allow a district court to "order restitution in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3); 18 U.S.C. § 3663A(a)(3) ("[T]he court shall also order, if agreed to by the parties in a plea agreement, restitution to persons other than the victim of the offense."). That amendment served to clarify the scope of *Hughey* and its progeny as allowing restitution beyond the offense of conviction when agreed to in a plea agreement. Simply put, a party may, in a plea agreement, stipulate to pay restitution on both the offense of conviction *and* relevant conduct. The enforceability of such plea provisions is well known and encapsulated in legions of cases, none of which the defense cited in their submission. *See, e.g.*, *United States v. Green*, 897 F.3d 443, 447 (2d Cir. 2018); *United States v. Marino*, 654 F.3d 310, 318 n.5 (2d Cir. 2011); *United States v. Shaw*, 446 F. App'x 357, 359 (2d Cir. 2011); *United States v. Silkowski*, 32 F.3d 682, 688–89 (2d Cir. 1994); *United States v. Rice*, 954 F.2d 40, 44 (2d Cir. 1992).

In conformity with this statute and unbroken line of decisions, the Government and Butselaar agreed in the plea agreement that the Court, should it make certain factual findings, may order restitution for relevant conduct beyond Butselaar's count of conviction. As set forth above, overwhelming evidence showed that Butselaar was conducting the same scheme with Verwest's Offshore Structure that he was running with Van de Wall's Offshore Structure. The Court should thus order Butselaar to pay restitution for the tax loss associated with Verwest's Offshore Structure between tax years 2012 and 2017. As calculated by an IRS revenue agent, that figure totals $28,020,413, *see* 3538-75, which may then be reduced by $9,467,085 to account for money that

Verwest repaid when he voluntarily disclosed this issue to the IRS, *see* 3532-15 at 1. Combining the foregoing with the tax loss associated with Van de Wall's Offshore Structure in 2013, the total outstanding tax loss to the IRS from Butselaar's actions is $19,250,845.

In sum, the record is clear that between Van de Wall and Verwest's tax filings, Butselaar caused nearly $29 million in tax loss to the IRS, of which more than $19.25 million remains outstanding. Butselaar has committed to make restitution in that amount as part of the parties' agreement, and the Court should order him to live up to his promise.

### 5.    The Court Should Order Butselaar to Pay the Costs of Prosecution

Butselaar was convicted of violating 26 U.S.C. § 7206(2). As part of the sentence for that conviction, Butselaar is liable for "the costs of prosecution," 26 U.S.C. § 7206, a fact disclosed to him as part of the parties' plea agreement, Plea Agreement at pg. 1. In this case, the costs of prosecution total at least $63,011.01.[11] The Court should impose those costs on Butselaar as part of his sentence, consistent with Section 7206's statutory command.

### <u>Conclusion</u>

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence of 36 months' imprisonment, $19,250,845 in restitution, and $63,011.01 for the costs of prosecution.

Respectfully submitted,

DANIELLE R. SASSOON
United States Attorney for the
Southern District of New York

by: s/_____
Benjamin Klein
Shiva H. Logarajah
David A. Markewitz
Assistant United States Attorneys

cc: Counsel of Record (by ECF and Email)

---

[11] The Government is happy to provide an exact breakdown of these costs under seal if helpful to the Court.